PROVOSTY, J.
This is a suit in slander. At the time the slanders are alleged to have been uttered, the plaintiff was the daughter-in-law of defendant, but had abandoned her husband, and was, as. defendant thought, bringing scandal upon herself and upon' the family into which she had married, by allowing a Mr. Gilham to be too assiduous in his ■attentions to her, receiving his visits, and almost daily riding out with him in his buggy, and going to the moving picture shows with him. Defendant is one of the prominent business men of the city of Alexandria and a man of family and of considerable .wealth, an excitable, irascible, impulsive man, as we judge.
Plaintiff was born near Peoria, Ill., 25 years before the trial of this suit. At the age -of 17, while at school in Peoria, and her parents living on a farm in Minnesota, she was married to her second cousin. She abandoned him after 23 months, which was 5 months after her graduation, and went to live with her parents on their farm in Minnesota, and there taught school during the summer. The crops proving bad that year, her father failed in business. She says:
“It was found that we had talent, and that we could make good money on the stage, * * * and we went on the road.”
This was in the fall. By “we” she meant her father, her brother, and herself. After two months of theatrical life elsewhere, the family came to New Orleans. They had been there a year and a half, when, on the opening of the Hotel Bently in Alexandria, they were engaged as the orchestra at the hotel. This was in January, 1909. It was then defendant’s son met her; and some 17 months thereafter, in June, 1910, they were married. The young man’s parents objected to the marriage ; but he and plaintiff went together to Shreveport, and were there married. Before this marriage she figured in Alexandria as a young girl, unmarried; and while she testifies that her being a married woman was known to all her friends, the young man testifies that he learned of it only after their engagement, and that he then supposed her first husband was dead; and that it was only shortly before his marriage to her that he was informed of her husband being still living and undivorced from her. The date of her divorce from her first husband is not shown in the record; hut, as a matter of course, it preceded her second marriage. The young couple came to live with the defendant’s family at the Stonewall Hotel, of which the defendant is owner, and where defendant and his family were guests. After 3 or 4 months defendant moved with his family, including the young couple, to a fine residence, or mansion, on the outskirts of Alexandria. This he did in order to please the plaintiff, who did not like living at the hotel. The young couple remained with the family at this mansion until November, when *443 they moved to apartments which defendant had fitted np for them in the second story of a 'building he owned in the business part of the city. They had not been there more than a few months when plaintiff abandoned her husband, and went to live with her mother in Alexandria. Her husband, then, on April 24, 1911, filed a suit against her for separation from bed and board on the ground of abandonment, and caused a summons to be served on her to return to the matrimonial domicile. The evidence shows that the young man was deeply attached to her, and that the object of this suit was simply to cause her to return to him. This she did; but she testifies that her motive in doing so was merely to secure her diploma, which she had inadvertently left behind in departing. This return was in May. She evincing the desire to go and live in the country, to raise chickens, the defendant let them have a 20-acre farm which he owned about a mile or a mile and a half out of the city, and renovated and fitted up the cottage on this farm for them, and they moved into it. In the meantime, the father and mother of plaintiff had gone to fill engagements as musicians in other cities. At this time Gilham begari those attentions to plaintiff which later were the cause of the trouble 'between plaintiff and defendant. After four weeks plaintiff again abandoned her husband, and went to live with a Mrs. Reynolds in the city. Her husband had given her no cause for thus leaving him. She, on the witness stand, reproached him with nothing, except that she says he was without means and without employment, and that she was not able to support both him and herself, and that they were starving. He testified that he was well able to provide for her; and he produces receipted bills of the family expenses, which are far from showing starvation or even the pinch of poverty. She is a 'talented musician, and during her marriage exercised her art in the choirs of the churches; but whether for compensation does not appear. This second abandonment proved final. . Soon after it she left Alexandria to fill theatrical engagements in different cities, which she had contracted for while living with her husband. In October, 1911, she wrote to her husband from New Orleans:
“Gilham has called and delivered your message; I do not care a bit for you; leave me alone; go your way and let me go mine; I am leaving New Orleans this week for a trip of at least seven months.”
Gilham visited plaintiff in Atlanta, while she was filling a theatrical engagement there. On November, 11, 1911, he and she returned to Alexandria from New Orleans on the same train. They arrived at 1 o’clock in the morning, and went together in an automobile to the lodging of plaintiff’s father and mother. The husband, who happened to be at the station, followed them, and joined Gilham, after he had left her, to know if he had a message from her to him. The infatuated young man remained with Gilham until daylight, talking over the matter. I-Ie supposed Gil-ham to have been acting the part of his friend in his relations with the plaintiff. That same day he made another attempt to induce her to return to him by filing another suit and having a summons served upon her to return, but she paid no attention to the summons. From that time plaintiff remained in Alexandria, living with her parents, who had returned to Alexandria the preceding summer, plaintiff’s husband, by the way, helping to pay their expenses back. Plaintiff earned her livelihood by giving music lessons, playing in the choirs of the churches and at night at the picture shows. Gilham was very assiduous in his attentions to her. In January, 1912, he employed her father as bookkeeper, and soon afterwards employed her brother. I-Ie and she were seen together a great deal. They almost daily rode together in Ms buggy; and he was her constant escort to and from the moving *445 picture shows at night. Gilham was a business man of Alexandria, a widower 36 years old, with two children. This conduct of a widower and a married woman separated from her husband very naturally occasioned a good deal of gossip in the city of Alexandria, where pretty much everybody knows everybody else of any prominence, and friends and acquaintances of defendant reported to him th'e gossip, and he himself could not ¡avoid seeing what was going on almost daily under his own eyes. His son very naturally took offense at this conduct of Gilham, and gave signs of fast-growing resentment. He sought out Gilham and told him angrily he would have to cease, otherwise he would fix him, meaning he would kill him.
It must be well understood that all this time plaintiff was living with her parents, and that if she was a musician at the picture shows it 'was invariably in the company of her father or brother, as leader of an orchestra in which they were performers, and in no way lost respectability, but continued to enjoy the respect of everybody.
Defendant was greatly wrought up over this light and thoughtless conduct of his daughter-in-law, indeed much more so than a man of less excitable- temperament would have been, fearing that it might reflect upon his family, among whom were unmarried daughters, and was much concerned over the position of his son. He spoke repeatedly to Gilham, appealing to him to desist, and seems to have telephoned to him time and time again on the subject. Gilham would promise and not keep the promises. Things went on in this manner for several months, the tension on the part of defendant and his son increasing all the time. Defendant became desirous of having a full and final explanation with Gilham, and requested him to meet him for that purpose either at his, defendant’s, place of business or at the office of the lawyers who h,ad charge of the separation from bed and board suit of his son. Gilham would promise to come, but would not keep th'e promise. Why defendant did not go to Gilham’s place- of business does not appear. This was the condition of things when the eonversation took place out of which has grown plaintiff’s first ground of complaint. Gilham’s version of it is as follows:
“A. I was going down Third street and Mr. Sterkx was coming up Third street in a buggy, driving a horse, and I was reading some mail, and as I looked up I saw Mr. Sterkx, and I stepped from the edge of the sidewalk to the street, and he threw up his hands and says, ‘This is no place to discuss this affair;’ and I says to him, ‘This is.as good as any;’ and he says, ‘If you want to discuss this thing, you will have to meet me at John Blackman’s and John Overton’s office;’ and I says to him, T will meet you nowhere ;’ and he says, ‘If you want to see me, come to their office, or to my place of business;’ and says he was tired of this way the matter was going on. I said to Mr. Sterkx, ‘What have you got to do with the matter?’ He says to me, T have tried to keep the bridle on;’ and he said, ‘If this thing does not cease, I am going to take the bridle off;’ and I said to him that it was my advice ‘to keep the bridle on;’ and at this time Hanna rode up on his horse and asked why I was talking to his father, and his father threw up his hands and said, ‘Go on; you have got nothing to do with this affair;’ and I says, ‘Who in the devil has if Hanna has not;’ and Hanna rode on off, and Mr. Sterkx says, ‘Now, Gilham, let me tell you something; me and Webb knows what that woman is; she has fooled every one in our family but us, and we won’t stand for that any longer; in fact, she never had us fooled, she is a regular sport.’ He says: ‘You know that people who travel around, theatrical people, and especially people of that kind are known as sports;’ and I says: ‘You are attacking that little girl’s character pretty strong;’ and he says, T can prove everything on her; I can prove every d-■ thing I say about her.’ So, I says, ‘Well Mr. Sterkx, I don’t know anything about the little girl’s character, and what I know about her she is a lady in every respect, and you are dealing on dangerous ground; and he said, ‘If you don’t shut down on your attentions, I will show them something in Alexandria about that woman.’ Q. What was there — I want to direct your attention to it— what was said there with reference to the Boir tiers’ Convention? A. He says, ‘Yes, Gilham, you was down in New Orleans.’ I says, ‘Yes, during the Bottlers’ Convention;’ and I says, ‘Yes;’ and he says, ‘Mrs. Sterkx telephoned down there, and telegraphed to New Orleans and could not find you-all.’ At that I said, ‘Yes; I *447 was there.’ He says, ‘You and that woman was there together,’ and I have got two traveling men who say you got on a Pullman car.’ I says, ‘Yes ;’ and he says, T can prove you cannot show where you were registered in New Orleans.’ At that time, I says, ‘All right; I can show you where I stopped and can assist you in that.’ At that time he says: ‘Mrs. Sterkx could not find you there, and Mrs. Sterkx had a special motive in finding out.’ ”
In explanation of his desire to have a talk with Oilham, defendant testified as follows:
“Because he and Mrs. Sterkx were parading the street. At any time you would look out, you could see them in a buggy or in an automobile, or somewhere together, and I did not think it was right for a married woman, and it was because of my interest. The public was talking about it, and he promised me faithful he was going to cut it out.”
And, again:
“Between my son and Mr. Gilham, and I was doing everything in my power, consulting with my friends and with you, and the balance of them, and every one advised me not to let him do any shooting. And Gilham, I talked to him, and he promised to stop it, and he has not up to the present moment.”
Defendant practically admits having said the things here attributed to him, although not exactly in these same words, except that he denies the expression “regular sport.” He testified in that connection as follows:
“Q. They say that when you told Gilham that, you meant to charge your son’s wife with infidelity and of being untrue to her marriage vows, unchaste, and immoral. Is that a fact? A. I never used that language in my life. Q. Did you use any language with Gilham and attack the chastity of this plaintiff? A. No, sir; certainly not. Q. Did you, in that conversation, use ,any language that could have been construed that you believed and intended to convey the idea that she was unchaste and immoral ? A. No, sir; I did not. About that time I was trying to get her back home, and I certainly would not have wanted her back if I thought such. Q. In other words, you were trying to get her to return home as your son’s wife, and it is because of this you know you would not have said it, and you would not have wanted her back home if you had thought that she was unchaste and immoral? A. No, sir; I called on her father and mother and tried to fix things up_ with them. Garter and I did this. Q. You said Carter; what Garter was this? A. Garter who was her attorney at that time. Q. And you say he was trying to effect a reconciliation? A. Yes, sir. He and I.”
Defendant explains that the expression: “Me and Webb knows what that woman is; she has fooled every one in our family but us” — by saying that it meant no more than that the plaintiff having been on the stage would soon again crave that life of excitement and would not settle down to the quiet of domestic existence.
A few months later, in August, 1912, Gil-ham became a room boarder at the house of the parents of plaintiff — the first and only boarder they ever had. On the 9th of September occurred a conversation between him and defendant, out of which grows the second ground of plaintiff’s complaint. In that connection defendant testified:
“I was coining out of the Airdome, and I saw Mr. Gilham standing in front of the moving picture show, and I knew what he was there for [meaning that he was waiting for plaintiff to come out, in order to meet her and escort her home] and when I got there he ducked around and went in where the little Moore girl was selling tickets, but I suspected he was in there, and I stuck my head in the window and said, ‘Mr. Gilham, you did not comply with your promise to me;’ and he said, T will be there to-morrow;’ and I says: T bet you $50 you don’t;’ and he says, T bet you $50 I do;’ and I turned and went off.”
Gilham says:
“His remarks were simply this: That the good people of this town was tired of the way that me and that woman was living. I says, ‘You have made some pretty serious charges again, and you will have to prove them.’ He said, ‘By God ! I can.’ ”
Miss Moore, who was in the ticket office and heard all that was said, testified as follows:
“Q. Who started the conversation? A. Mr. Sterkx started it. Q. What did he say? A. ‘Gilham, you did not keep your promise;’ and he said, ‘No;’ and the next thing I heard was Mr. Sterkx said, ‘Meet me at John Blackman’s and John Overton’s office, and Mr. Gilham says: ‘No; I will not meet you at their office. I will meet you at your office;’ and Mr. Sterkx says, T bet you $50 you don’t.’ Q. Was anything else said? A. That is all I remember them saying. * * * Q. Did you hear Mr. Sterkx say to Mr. Gilham that ‘the decent people of this town are not going to stand for the way that you and that woman are living?’ A. I am sure I never heard that.”
*449 The next alleged slander complained of is said to have been uttered to a Mr. Salisbury, the manager of the Airdome picture show where plaintiff was leader of the orchestra. Mr. Salisbury testified, as follows:
“As I came out of the Airdome, I just heard the fag-end of the conversation. I heard Mr. Sterkx say to Mr. Gilham, T bet you $50 you don’t;’ and I heard Gilham say, T bet you $50 I doand Mr. Sterkx walked away; and I asked Gilham what the trouble was, and he said Mr. Sterkx had asked him to come down to his place of business, and he told him he would do so. Q. And you went, where? A. I went on up to the ice cream parlor, and Mr. Sterkx came in there and said he wanted to see me, and I went out with him; and he asked me if I heard the conversation, and I told him that I heard a part of it; and then he asked me if I knew the way in which these people were living, and he says to me, ‘You are a pretty good friend of Gilham, and you o.’"''t to know;’ and I told him I did not; and the only remark he used was that the decent people of Alexandria was not going to stand for the way this man and woman were living. * * * Q. Did you not tell Sterkx that you told Gilham he would be a fool to go to Sterkx’s office? A. Yes, sir; I did.”
In the same' connection, defendant testified:
“Mr. Salisbury came out just as I was leaving, and I saw Gilham talking to Mm, and as I went on home I got to thinking about it, and I came back to the drug store and called Mr. Salisbury out and asked Mm if he heard the conversation between Mr. Gilham and me. He told me he heard Gilham say he was coming down to my office, and he told him not to do it; that he would be a damn fool; and I said to Salisbury, ‘You are dipping into this thing yourself.’ I would not talk to him in front of the drug store. We went up the line, and we talked about this proposition between Verna and Gil-ham. * * * Q. You explained to Salisbury what you had been talking to Gilham about? A. Yes, sir. Q. What did you tell Mr. Salisbury? A. I simply told him that Mr. Gil-ham had been promising to come to my office and discuss this matter about the way he and Verna were going around town together, and Salisbury told me he would be a damn fool to do that. Q. Was anything said about the way the decent people of Alexandria or- the people of the town would not stand for the way or the manner in which this man, meaning Gil-ham, was paying attention to this woman, meaning Mrs. Verna Murphy Sterkx? A. I did not think the people had anything to do with it, and did not make any remark of that kind. Q. What did you tell Salisbury about that? A. I mentioned to him that it should be stopped, and that every one else was talking about it, and would not stand for it. Q. You told him that you would not stand for it; stand for what ? A. For Gilham and Verna to be parading the streets continually; that the public was talking about it; and that the public would not stand for it. Q. Did you say anything about trouble? A. That there might be trouble if it was not stopped.”
A. M. Hathaway corroborates Mr. Salisbury on the point of defendant having used the expression that the people of Alexandria would not stand the manner in which plaintiff and Gilham were living.
Plaintiff complains that, quoting her petition, some time after this—
“as she was walking down Johnson street defendant walked behind her for a considerable distance,_ probably half a square, and in a loud and jeering tone of voice, so that it could be, and was, heard for a considerable distance by the bystanders and passers-by, applied to petitioner in an insulting manner the epithet, ‘rotten,’ repeating it time after time, by which he meant to insinuate that your petitioner was vile, unchaste, and immoral, and to hold her up to public ridicule, obloquy and contempt.”
Without going into a lengthy statement of the testimony on this last point, we will say that we are satisfied that this epithet was directed to Gilham, and not to plaintiff; and that it meant no more than to qualify the conduct of Gilham in openly and flagrantly violating and disregarding entirely his promises to abstain from his public attentions to plaintiff. While it is sought to be made to appear that Gilham had gone beyond ear shot when the.remark was made, we are satisfied he had not. One reason, if no other, for accepting defendant’s side of that question is that nothing in the record shows that at any rate up to that time, he entertained any ill will whatever towards plaintiff, or that he has at any time had the slightest disposition to. bring her into disrepute, but that, on the contrary, he at that time would have liked to shield and protect her from popular animadversion, and restore her to the bosom of his family; whereas, his resentment against Gilham had at that time about reached the bursting point, as is proved by his *451 coining to blows with him shortly thereafter.
Another charge is made by the plaintiff; but as the evidence offered to support it falls short of so doing, we pass it by without further mention.
Defendant testified, as follows:
“Q. Have you ever intentionally tried to slander or humiliate or attack the virtue or chastity of this plaintiff? A. Never in my life. Q. You alleged in your answer that you talked to Gilliam about this matter; did you believe you had the right to talk to him? A. I knew I had a right; I could not help it. I could not possibly let a thing like it go on. I did not want to see it going on, and I simply could not help it. Q. And on. that account you were trying to avoid a possible homicide also? A. Yes, sir.”
In October, 1912, plaintiff went on a visit to her grandmother in Peoria, III. Gilham testified, as follows:
“Q. You told Sterkx that she had gone to Reno? A. Yes, sir. Q. Did he not tell you that if that was true and she had a decree of divorce, he had nothing more to do with her? A. Yes, sir. * * * Q. When you told him that she had been to Nevada and secured a divorce, what did he say? A. T will wipe my hands of the whole business.’ I believe he said that.”
[1] The impression we have derived from reading the voluminous testimony has 'been the same as that of the trial judge, that defendant entertained no malice towards plaintiff; that, very far from seeking to defame her, he, on the contrary, was anxious to protect her as far as in his power lay against Gilham and, perhaps, against-herself, by putting an end to what appeared to him to be flagrantly indiscreet conduct, and to restore her to his son as a not unworthy wife; and this in the interest of his family, his son, and herself.
His conversation with Gilham was for a serious and important purpose. He was desirous of having it, not in order to disparage or malign plaintiff, but from the most laudable motives. If it took place in the street, it was not his fault. He himself desired that it should be by appointment at the office of the lawyers, and should wear the aspect of a deliberate conference at which Gilham might be made to understand that he was wrecking the young man’s happiness, and perhaps the girl’s too, and induced to desist. He was not speaking to some one who would be likely to treat what he said as salacious gossip to be spread around, but to a friend — ■ indeed, an entirely too devoted friend — of plaintiff’s. And so, in like manner, he sought out Salisbury and spoke to him as to plaintiff’s and Gilham’s friend, not in vindictiveness or through idle malice, but in furtherance of the laudable purpose which, with all the earnestness of his soul, he was endeavoring to accomplish.
[2] Now, when it comes to the meaning of the terms he used, which in plaintiff’s pleadings have been given the very worst possible interpretation, we are satisfied that by the word “living” he meant no more than the public exhibitions which this young woman and Gilham were giving of themselves; and, as to the word “sport,” if he used it at all, he meant it in the sense which he himself in the same conversation explained to Gilham he understood it had, namely:
“You know that people who travel around, theatrical people, and especially people of that kind, are known as sports.”
It will be noted that in saying this of plaintiff he is quoting his unmarried daughter, Miss Webb Sterkx, as having expréssed the same idea, and he would hardly be reporting his young daughter as having charged the plaintiff with being a loose woman. The drift of his talk, in the light of his purpose in having it, was simply that this young woman, who had had a taste of life upon the stage, would not take readily to a life at home, and that by his attentions Gilham fostered this disinclination on her part, and counteracted all the good influences which were being sought to be brought to 'bear upon her to accept and be content with her lot as she by her marriage had made it.
*453 “That words are to be understood in the connection in which they are used, and are not to be attributed a signification other than that which the context would show them to have, is abundantly established in the law of libel and slander.” Flanagan v. Nicholson Pub. Co., 137 La. 588, 68 South. 964.
[3] Nor is the proof conclusive that the defendant used this expression at all. Gilham says he did, and defendant denies it. True, defendant has very greatly weakened his testimony on this point by denying his havilig used in this conversation other expressions which he subsequently admitted having then used, and, in fact, one of which he expressly admitted in his pleadings having used; but Gilham’s reliability as a witness is also much detracted from by the fact of his having testified to something having been said on the occasion of his meeting with defendant in the ticket office of the theater, which Miss Moore positively testifies was not said; and by the fact of his being a deeply prejudiced witness. And there is also the improbability of defendant’s having intended to apply to plaintiff any such epithet — an epithet which the average man would not be likely to apply to a daughter-in-law whom he was desirous to retain in his family. Even so, however, the attempted evasions of defendant, when questioned on the witness stand in regard to this conversation, has impressed us very unfavorably, and we should perhaps consider the proof sufficient were it not that in cases of this kind something more than a somewhat doubtful preponderance of the evidence is required.
“Cases of this kind partake more or less of the nature of a criminal accusation, and therefore the preponderance of proof required for making out plaintiff’s case should be somewhat more decided in them than in ordinary civil actions.” D’Echaux v. D’Echaux, 133 La. 123, 62 South. 597.
Plaintiff has striven hard in her testimony to make out that defendant bore her ill will, but all the circumstances of the case rebut that conclusion.
We do not think the good f¿ith and absence of malice on the part of defendant in all these matters could be seriously questioned. Such conduct as his in this case is not what the law means by slander.
Judgment affirmed.