MOISE, Justice.
 

 Plaintiff brought this action in the Twenty-Second Judicial District Court for the Parish of Washington, State of Louisiana, for an alleged libel appearing in the May 17, 1947 issue of the New Orleans Item, consisting of the publication of his picture along with several others, beneath the headline and above the explanatory paragraph hereinafter detailed. The petitioner alleges that the statement published in connection with the picture was entirely false, malicious, libelous and defamatory of his good name, etc. He prayed for damages in the sum of $50,000. At the time of the publication, he was the Sheriff of Washington Parish;- the origin of the publication was at the domicile of the newspaper
 
 in
 
 the City of New Orleans, Parish of Orleans, La.
 

 The defendant filed an exception to the jurisdiction of the court rationae persona, which exception was overruled by the district court under the authority of Article 165 of the Code of Practice and the case of Vicknair v. Daily States Publishing Co., 144 La. 809, 81 So. 324. Thereafter, defendant applied to this Court for a writ of prohibition restraining the' trial court from entertaining jurisdiction of the case. After considering this application, we refused defendant’s request, assigning as our reason therefor that the trial court’s “ruling is correct”. The defendant then filed an answer admitting the publication and denying that it was “false and malicious”, as alleged by the plaintiff.
 

 After a trial on the merits, the district -court denied recovery by the plaintiff -and dismissed his -suit. Plaintiff appealed.
 

 The record reveals that in April, 1947, the now famous “milk war” was in full
 
 *851
 
 force, and as the strike increased there was general lawlessness prevailing, striking at the very vitals of interstate commerce. The arm of the National government reached out and indicted some 60 persons from the Florida Parishes for their alleged acts of violence. Among these were a group from Washington Parish and, in order to post their bonds, it was necessary for them to appear in the Federal Court Building in New Orleans. The plaintiff, then the Sheriff of Washington Parish, and a personal friend to some of the men indicted, accompanied them to New Orleans for the purpose of aiding them. After their bonds had been posted and as they were leaving the Federal Court Building the Item newspaper reporter took their pictures, and on May 17, 1947, the picture appeared in the Item newspaper, which is circulated in the Parish of Washington and, generally, in the State of Louisiana. The headline over the .picture read:
 

 “Mil'k War Indictees Photographed Despite Their Threats”, and beneath the picture there appeared the following explanatory note:
 

 “Some of the men indicted by the federal grand jury on conspiracy charges growing out of the recent milk strike and other figures in the case were photographed by the Item’s Bill Sadlier as they left the federal building despite threats to smash his camera. They áre part of a large group from the Florida Parishes who appeared before Commissioner Carter and posted
 

 bonds. This was the second federal indictment to follow the milk war which raged for ten days last March and early April.”'
 

 No names appeared under the picture.
 

 The gravamen of the plaintiff’s complaint is that the publication inferred that plaintiff had been indicted by a Federal Grand Jury in Orleans Parish, La., for conspiring to interfere with the movement of interstate commerce under an act of the United States Government commonly called and referred to as the Anti-Racketeering Act, 18 U.S.C.A. § 1951, for his alleged participation in a milk strike which occurred in the Florida Parishes during the Spring of 1947, which had been highly publicized by defendant; and that the publication was false and was a representation to the eye of the public which exposed him to hatred, contempt and ridicule causing him to be shunned and avoided, and had a tendency to injure him in his position of public trust.
 

 The defendant contends that plaintiff’s photograph in the publication of which he complains, appeared simply in connection with his having accompanied the persons so indicted to the office of the United States Commissioner; that defendant did not intend that said publication should be read or understood as stating or implying that plaintiff was one of those indicted; that the publication contained no such statement or implication, nor was such article so read or understood; and that said publication was made without malice, in good faith, .in
 
 *853
 
 the public interést, and was justified and privileged.
 

 An examination of the published photographs shows four men, and immediately next to these four men is the picture of another person marked off from the four by a perpendicular line. Next to his picture is that of the plaintiff, similarly marked off with a perpendicular line. This line separates the plaintiff from the group of indictees. There are no names given under the picture. The headline over the picture states “Milk War Indictees Photographed Despite Their Threats”, and immediately beneath the photographs is the explanatory note hereinabove set out.
 

 Were we to limit our consideration only to the pictures and headline, there may be a likelihood of a libel by implication. However, the explanatory note states that the photographs were of “Some of the men indicted by the federal grand jury * * *
 
 and other figures
 
 * * * photographed * * * as they left the federal building * * One would hardly see the photograph without seeing the paragraph of explanation. Therefore, it is evident that the reader, after reading the explanatory item along with the pictures and the headline would see that neither expressly nor by implication was the plaintiff one of the indictees in the case, nor could they say (and this was clearly borne out by the testimony adduced upon the trial) that the publication tended naturally and reasonably to injure the reputation of the plaintiff. He may be one of the
 
 other figures
 
 but this is not libel because it is true. The publication does not import that plaintiff herein was a law-breaker or a milk-war indictee. Furthermore, we must bear in mind that the publication was prompted by a desire to advise the public concerning a matter of grave importance and one in which it had a vital interest — the curtailment and stoppage of the milk supply by violaters of the U. S. Anti-Racketeering Law, who were accused of stopping trains and milk trucks and threatening to blow up dairy plants unless interstate milk shipments stopped. The plaintiff in this case is a man of position and character and has always maintained a high standing in the community in which he lives. No one could reasonably say that the publication is a reflection upon his good character and standing. From a study of the whole of the publication, the surrounding circumstances, as well as the testimony of many reputable witnesses, this conclusion is irresistible.
 

 In the case of Tate v. Nicholson Publishing Company, 122 La. 472, 47 So. 774, 776, this Court aptly stated:
 

 “In determining the question of the liability of the defendant,
 
 it is our duty to take into consideration all the circumstances of the case. We should give weight to every fact having a legal bearing on the publication. We must consider the occasion on which it is made, to ascertain how far, in view of that occasion and of every
 
 
 *855
 

 thing that was then said by the defendant with reference to the matters
 
 published,
 
 whether the publication
 
 should,
 
 as to its character, be held to be libelous or not.
 

 "Our conclusion must be based upon the situation taken as a whole.
 
 In Newell on Defamation, Slander and Libel, § 29, the author says:
 

 “ ‘The sting of a libel may sometimes be contained in a word or sentence placed as a heading to it. The defendant will often be held liable merely in consequence of such prefix, where, without it, he would have had a perfect answer to the action. So a word added to the end may vary the sense of the preceding paragraph.
 

 “ ‘The defendant is therefore entitled to have the whole alleged libel read as part of plaintiff’s case. And for the purpose of showing that what he wrote was no libel, and will not bear the construction which the plaintiff seeks to put upon it, he may give in evidence any other passages in the same publication which plainly refer to the same matter or which qualify or explain the passage sued on.’
 

 * * * * * *
 

 “A publication, said Blackford, Judge (in Armentrout v. Moranda, 8 Blackf. [Ind.] 426), to be a libel, must tend to injure the plaintiff’s reputation and expose him to public hatred, contempt and ridicule. A libel, said Chief Justice Booth in State v. Jeandell, 5 Har. (Del.) 475, is a malicious publication in printing, writing, signs, or pictures imputing to another something which has a tendency to injure his reputation, to disgrace or degrade him in society, and lower him in the esteem and the opinion of the world, or to bring him into public hatred, contempt, or ridicule.” (Italics mine.)
 

 Our own State Constitution, in Article I, Section 3 of the Bill of Rights, provides :
 

 “No law shall ever be passed to curtail or restrain the liberty of speech or of the press; any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty.”
 

 The issue here is the responsibility for the alleged abuse of the liberty granted by the Constitution to the press. This Court has construed this Article to mean that the press is free from all censorship over what shall be published and is entirely exempt from control in advance, or restraint by injunction. The liberty enjoyed by the press includes even that which may be of a libelous nature, the party injured having his remedy after publication. State ex rel. Liversay v. Judge of Civil Dist. Ct., 34 La. Ann. 741; "State ex rel Phelps v. Judge of Civil Dist. Ct., 45 La.Ann. 1250, 14 So. 310, 40 Am.St. 282; Schwartz v. Edrington, 133 La. 235, 62 So. 660, 47 L.R.A., N. S., 921, Ann.Cas. 1915B, 1180. The Court is bound to give full effect to the Constitution, in that the law prescribes that the remedy proposed will come after publication, with the Court as the arbiter of the
 
 *857
 
 rights of the parties. The Congress, the Executive Departments, the Legislature, the courts, the press, all, sometimes show an enterprising ambition to further extend power. It is because of this fact, -on questions of power, that Thomas Jefferson was prompted to write “ * * * have no confidence in man but bind him down from mischief by the chains of the Constitution”.
 

 While the Court is the judge of the abuse of power granted to the press, the only check and balance which it has on its own exercise of power is its own sense of self-restraint. It should, therefore, ever be on guard so as not to permit its own prejudices to become legal principles. After a -careful consideration of all of the facts and surrounding circumstances of this case and construing the picture, the headline, and the explanatory note as a whole, it is our conclusion that the publication does not -fairly and reasonably infer or imply that the plaintiff was one of the indictees as contended by him. In reaching this -conclusion, however, we want to convey that the freedom of the press, as secured by the Fourteenth Amendment to the Federal Constitution, does not impart an absolute right to publish without responsibility whatever one may choose, or an unrestricted and unbridled license that affords immunity from any possible use of language, or which prevents punishment for abuse of such freedom. Unconstitutional exercise of power is subject to judicial restraint. There are limits beyond which the press must not go. When the power of the press in this Democracy is properly exercised, it is said to be “the pillow of a freeman’s hope, the center of the nation’s desire.”
 

 The judgment appealed from is affirmed at appellant’s cost.