245 So.2d 430 (1971)
P. Rayfield BROWN, III, Plaintiff-Appellant,
v.
NEWS-WORLD PUBLISHING CORP., Defendant-Appellee.
No. 11584.
Court of Appeal of Louisiana, Second Circuit.
March 2, 1971.
Paul Henry Kidd, Monroe, for plaintiff-appellant.
Thompson, Sparks & Cudd by James D. Sparks, Monroe, for defendant-appellee.
Before BOLIN, HEARD and HALL, JJ.
HALL, Judge.
This is an appeal from a judgment sustaining an exception of no cause of action and dismissing plaintiff's libel suit.
Plaintiff's petition alleges that:
(1) Plaintiff is an ordained minister domiciled in Ouachita Parish;
(2) Defendant is the owner of the Monroe Morning World, a newspaper published each morning in Monroe and distributed throughout Louisiana, Mississippi, Arkansas and other states;
(3) The March 21, 1969, edition of the Monroe Morning World contained an editorial defaming petitioner (the editorial being set forth in full in plaintiff's petition);
(4) Numerous news stories printed both before and after March 21, 1969, *431 make more meaningful the "accusations, innuendos and half-truths" contained in the editorial (some of which news stories were attached to plaintiff's petition as a part thereof);
(5) The editorial exposes plaintiff to disrepute and ridicule and lowers him in the opinion of his colleagues, his congregation and the general public by picturing him as "one who is a pig, a criminal, an incompetent, lazy and dishonest"; and
(6) The accusations in said editorial constitute an "unwarranted, false, malicious, and libelous attack" on plaintiff's professional skill and personal and professional reputation.
Plaintiff prays for damages in the total amount of $550,000.00.
The editorial complained of reads as follows:

"`Wrong' People in Trough
"If you throw a generous amount of slop into a trough in a pig pen, the pigs and hogs will fight like fury to get more than their share. In fact, one pig by himself won't grow as fast as each one of a number of pigs together because he has no competition over the feed.
"Now comes the Office of Economic Opportunity in Washington with claims that the wrong set of people had been gobbling up the lush funds supplied by the OEO. The OEO made a claim, which may have been totally unsubstantiated, that the group which took over was Ku Klux Klan-connected. The real reason seemed to be that the antipoverty program was being run by white people and not by Negroes. Actually, it appeared, an honest attempt was made to take the waste out of the anti-poverty program.
"The government seems to be clinging to the idea that there's nothing like seeing to it that the right people are made fat at the trough.
"Really, there's nothing like letting honest people run the anti-poverty program.
"Many millions of dollars have been squandered in the anti-poverty program, with a large part of it going to pay thugs and rioters picked up on the streets to `work' as `teachers' and `leaders' in makework projects. Many of these people, to pay for crimes they have committed, should be in the penitentiary.
"But here, from OEO's viewpoint, is the sad part of the tale. `Aided by white politicians,' as the complaint goes, three men `with Ku Klux Klan connections' got places on the anti-poverty governing board for that particular area and stripped the Negro director of his salary and his job. It was losing his fat pay that he complained most about.
"But, `turn about is fair play,' so the OEO threw out the people who were trying to clean up the program. The government, at least during the administration of former President Lyndon B. Johnson, thought it was a good thing to put criminals on big, fat government salaries, so they wouldn't be motivated to commit more crimes.
"But to give non-integrationists fat government pay whether they are criminals or non-criminals is unthinkable and unspeakable in OEO's view. That may be true but we never have liked hiring law-violators for `teaching' and `leadership' jobs, so why not just toss the whole thing out?"
The news stories made a part of plaintiff's petition generally trace developments relating to the Ouachita Parish Community Action Program from March 3, 1969 to September, 1969. A news story dated March 4, reported that plaintiff's resignation as executive director was approved by the CAP board on March 3, with protests from several board members based on *432 reasons generally complimentary to plaintiff. News articles dated March 18 and thereafter reported that the Ouachita Parish antipoverty program was being investigated by the Office of Economic Opportunity in Washington in connection with alleged Ku Klux Klan influence and domination or takeover of the program by a white group. The March 18 article mentioned that "P. Rayfield Brown, Negro director of the CAP program, had most of his executive power stripped away." A story published on the 19th quoted Brown as denying the reports of a takeover of the program by certain persons. An article on the 20th reported that the Negro director of the program who had been stripped of his powers had his powers, and job, reinstated. An article on March 22 reports plaintiff as serving until a replacement as executive director could be found. Subsequent articles trace further developments in connection with the antipoverty program, none of which are pertinent here.
Nothing contained in the news stories published prior to and subsequent to the March 21 editorial is defamatory or derogatory toward plaintiff, but these stories do clearly identify plaintiff as the Negro director referred to in the editorial.
Defendant filed an exception of no cause of action on the grounds that (1) the editorial contains no reference to plaintiff by name or by which he is identified individually or officially (2) the editorial contains no words, language or expression constituting a libelous attack on and defamation of the reputation of plaintiff, and (3) the editorial is a criticism of a governmental agency and its administration, which criticism is protected by the First and Fourteenth Amendments to the United States Constitution.
In sustaining the exception of no cause of action, the district court, in written reasons, held that the editorial was a general criticism of the Office of Economic Opportunity, and that the reference to plaintiff, although "caustic and harsh" was not a libelous statement.
The threshold issue in any libel action is whether or not the statements made are defamatory or libelous.
A statement is defamatory when it tends to expose a person to contempt, hatred, ridicule or obloquy; or which causes a person to be shunned or avoided; or which has a tendency to deprive him of the benefits of public confidence or injure him in his occupation; and includes almost any language which upon its face has a natural tendency to injure the person's reputation, either generally or with respect to his occupation. The intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as libelous but from the context as well, and the true meaning must be ascertained from a consideration of all parts of the statement as well as the circumstances of its publication. The test is the effect the article is fairly calculated to produce and the impression it would naturally engender in the minds of the average persons among whom it is intended to circulate. Madison v. Bolton, 234 La. 997, 102 So. 2d 433 (1958); Mulina v. Item Co., 217 La. 842, 47 So.2d 560 (1950); Tate v. Nicholson Pub. Co., 122 La. 472, 47 So. 774 (1908).
An exception of no cause of action admits, for the purpose of consideration of the exception, all facts that are pertinent and well-pleaded in the petition. In determining whether plaintiff has set forth a cause of action for libel this court should give due weight to every portion of the articles complained of and to every fact set out in the petition. Otero v. Ewing, 162 La. 453, 110 So. 648 (1926). See also Gray v. Ouachita Coca Cola Bottling Company, 126 So.2d 862 (La.App. 2nd Cir. 1961).
Plaintiff has alleged and contends that the editorial in question portrays him as "a pig, a criminal, an incompetent, lazy and dishonest". Accepting the well-pleaded facts of plaintiff's petition as true, but not the conclusions drawn by plaintiff therefrom, and viewing the editorial in a *433 light most favorable to the position of plaintiff, we nevertheless conclude that the editorial does not portray plaintiff in the defamatory manner he contends, either directly or by insinuation.
The trial judge's analysis of the editorial is well stated:
"The first five paragraphs of the editorial do not contain any actionable statements. It is obvious that it is a general criticism of the Office of Economic Opportunity. It begins by insinuating that the Office of Economic Opportunity was created as `pork barrel' legislation. It states that many millions of dollars had been paid to `thugs and rioters' to work as `teachers' and `leaders' in the program; that many of the workers were criminals. The sixth paragraph, even though it be viewed as referring to the plaintiff, does not contain a statement which is legally libelous. It merely points out that the `antipoverty governing board' for a `particular areastripped the Negro director of his salary and his job', and then comments, `It was losing his fat pay that he complained most about.' Although the comment is caustic and harsh, the Court does not consider the statement legally libelous. Nor is there a libelous statement in paragraphs seven and eight of the editorial. Plaintiff alleges that reading of the news articles preceding the editorial `make more meaningful the accusations, inuendos, and half truths contained in subject editorial'. The Court has carefully read the news articles referred to through March 21, 1969 and finds that rather than lead one to the conclusion that there was wrongdoing on the part of the plaintiff, all references to the plaintiff negate the idea of his wrongdoing. For example, the news article of March 4, 1969 mentions the plaintiff's resignation and then contains statements that he had `been a competent executive'. The news article of March 18, 1969 comments on the fact that `P. Rayfield Brown, Negro director of the CAP program, had most of his executive power stripped away'. The article does state that `those Negroes who had run the program since 1966 were accused publicly of inefficiency, indolence, corruption and theft', however, this is immediately followed by the comment that `The OEO said federal audits have shown no evidence of any such discrepancies.'."
Although the editorial may be "harsh and caustic", and perhaps crude, it does not defame plaintiff. We hold that the language of the editorial, read as a whole, is not capable of a defamatory meaning. Since plaintiff has failed to allege statements that are capable of a defamatory meaning, he has failed to set forth a cause of action. See Gray v. Ouachita Coca Cola Bottling Company, 126 So.2d 862 (La.App. 2nd Cir. 1961), in which this court dismissed a suit for damages allegedly resulting from slanderous remarks on an exception of no cause of action. See also Kihneman v. Humble Oil & Refining Company, 312 F.Supp. 34 (E.D.La.1970)[1] *434 and Bellis v. Times-Picayune, 226 F.Supp. 552 (E.D.La.1964), in both of which cases libel actions were dismissed by summary judgment.
In view of our holding that the editorial is not capable of a defamatory meaning, it is unnecessary for us to consider the defenses raised by defendant based on New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Garrison v. Louisiana, 379 U.S. 64, 13 L.Ed. 2d 125, 85 S.Ct. 209 (1964); and Bienvenu v. Angelle, 254 La. 182, 223 So.2d 140 (1969).
The judgment of the district court is affirmed at appellant's cost.
Affirmed.
NOTES
[1] Judge Rubin summarized the applicable Louisiana law as follows:

"This action for defamation must be dismissed not only because the allegations with respect to Kihneman are protected by the qualified privilege but also because, fairly read, the allegations about him made in the complaint and accompanying documents, when taken as a whole, were not defamatory. The threshold question in any defamation action is whether the words used are capable of a defamatory meaning. Although Louisiana's sparing use of jury trials makes it difficult to determine from its reported opinions exactly what questions are legal ones, to be decided by the court or fact ones, to be decided by the jury, Louisiana would appear to follow the prevailing view that `whether the words used, are capable of a defamatory meaning' is a question of law for determination by the court, not a jury. See Albert Miller & Co. v. Corte, 5 Cir. 1939, 107 F.2d 432, 434, applying Alabama law. Once the court concludes the words are capable of bearing a defamatory meaning, it becomes a jury question whether the words as applied to the plaintiff in fact defamed him.
"In deciding whether the words are capable of a defamatory meaning, the publication must be read as a whole. Otero v. Ewing, 1926, 162 La. 453, 110 So. 648; Tate v. Nicholson Pub. Co., 1908, 122 La. 472, 47 So. 774. The words must be construed according to the meaning that will be given them by reasonable individuals of ordinary intelligence and sensitivity. Their significance must not be distorted to give an unusual meaning, and they are to be understood only in the context in which they were used and in the manner shown by the circumstances under which they were used. Otero v. Ewing, 1926, 162 La. 453, 110 So. 648; Sterkx v. Sterkx, 1915, 138 La. 440, 70 So. 428; Flanagan v. Nicholson Pub. Co., 1915, 137 La. 588, 68 So. 964. See also, Gatley on Libel and Slander, Third Edition, 1938, quoted in Albert Miller & Co. v. Corte, 5 Cir. 1939, 107 F.2d at 434-435."