482 So.2d 876 (1986)
Bobby GARRETT, Appellee,
v.
Roger KNEASS, et al., Appellants.
No. 17446-CA.
Court of Appeal of Louisiana, Second Circuit.
January 22, 1986.
Writ Denied March 21, 1986.
*877 Loridans, Beresko & Loridans by Henri Loridans, Bossier City, for appellee.
Bowers & Bowers by Gary A. Bowers, Shreveport, for appellants.
Before JASPER E. JONES, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
This is a suit for defamation. The defendant, Roger Kneass, allegedly called the plaintiff, Bobby Garrett, a "thug" in a crowded room. Kneass then went to a restaurant and reported to several people that Garrett had threatened his family. That night, one of the people to whom he had reported the incident appeared on the evening news and repeated the alleged threats. Finally, Kneass sent a letter to the mayor, the Shreveport Times, Journal, the U.S. Attorney General and the FBI, complaining of threats to his family. Garrett sued, claiming damages of $150,000 for humiliation and embarrassment, and loss of future income. The trial court, in oral reasons for judgment, dismissed the claim for lost income, and this portion of the case is not up for review. On the issue of defamation, however, the trial court ruled that each of Kneass's acts was defamatory. The trial court granted a judgment of $10,000, and Kneass now appeals. We find that the judgment was based in part on an incorrect application of the proper legal standards. Not all of the alleged acts entitle the plaintiff to recovery. Accordingly, we affirm and amend.

FACTS
The incidents occurred in the context of the hotly-contested Bossier City mayoral race in the spring of 1984. The plaintiff, Bobby Garrett, was an active campaigner for candidate Don Jones, who ultimately won the election. The defendant, Roger Kneass, was an active campaigner for Jones's opponent, Pat Anding, the wife of the deceased prior mayor. Jones and Anding were waging hard campaigns with enthusiasm and heat that carried down to the supporters. Frank Blackburn was the interim mayor.
The candidates squared off at a "Firing Line" debate at the Holiday Inn on March 28, 1984. In addition to the standard debate, the candidates fielded questions from the floor. Bobby Garrett and Roger Kneass were in attendance and Kneass asked some pointed questions of candidate Jones. Kneass asked Jones about some political meetings between Jones, Garrett and others, in which Jones allegedly proposed to hand-pick Garrett for various political offices. Garrett did not like the implications of these questions. When the debate had ended, the reporters left and the crowd was thinning, Garrett walked up to Kneass, intending to express his displeasure. *878 Kneass was standing at the rear of the room, close to the coffee table, visiting with various people. Garrett extended his hand, not in a friendly gesture but to tap Kneass on the shoulder or arm and attract his attention. He then spoke, and what he said was the subject of dispute. According to Garrett, he said, "If you're going to mention my name in public, I'd appreciate you getting the facts straight." According to Kneass, Garrett told him, "We don't like the questions you're asking. If it continues, you had better keep an eye on your family." Several witnesses testified that they had heard bits and snatches of conversation. All but one denied hearing Garrett use the word "family"; and that witness insisted that Garrett was referring to his own family. The trial court found that Garrett did not threaten Kneass's family.
Regardless, when Garrett got through speaking, Kneass looked out into the thinning crowd till he spied Don Jones, and shouted to him, "Jones, get your thugs away from me." All the witnesses heard this outburst, but none of them was quite sure that Kneass was talking about anyone in particular. According to Garrett, Kneass repeated this in a loud voice two or three times, but everyone else heard it only once.
As soon as he had delivered his blunt statement, Kneass turned on his heels and left the room. Garrett started after him but quickly gave it up, muttering, "The heck with it." Another Jones supporter, a Mr. Hall, thought Kneass had referred to him, and lunged in Kneass's direction, but was restrained by two or three people. In Kneass's absence, the Jones supporters laughed off the incident.
Kneass went in haste to the police station, where he allegedly reported the threat to the authorities, but the record contains nothing about this. Kneass's next stop was the restaurant at the Holiday Inn. Ms. Anding, Mayor Blackburn and a few other guests were there having dinner when Kneass burst in and told them what had happened. He was emotional. Mayor Blackburn attempted to reassure Kneass that nothing would come of it. Ms. Anding, however, was not reassured. She said she needed to go to the news media and let them know what was going on. She expressed the need to protect her workers' families' lives. Notably, Kneass did not assent to this or even encourage it; rather, Ms. Anding suggested it and Mayor Blackburn approved it. That evening, she appeared on the Channel 12 news and related Kneass's version of the story.
After the election, Kneass sent a letter to the victorious Don Jones. The letter is strong: it warns Jones, in no uncertain terms, that Kneass will be keeping an eye on Jones and making every attempt to unseat him in the next election. He starts out by mentioning "what happened at the Firing Line debate" and Jones's "gang." After covering other subjects, Kneass says in the foot of the letter that Jones should keep Garrett and others, whom he names, as far away from his family as possible. Kneass sent copies of this letter to the Times, the Journal, the FBI and the U.S. Attorney General. The record does not establish whether the newspapers actually printed this letter.
Garrett called a number of witnesses to prove his damages. Only one witness, Mayor Don Jones, for whom Garrett had worked so hard, said that his opinion of Garrett was diminished by the incident. Mayor Jones said he would not hire Garrett for any "directory level" positions, but admitted that Garrett had never applied for one. The trial court found that Garrett's subsequent change in employment was not directly attributable to the Firing Line incident and that Garrett's lost employment potential was inadequately proved. Garrett did not appeal this aspect of the judgment. The other witnesses expressed some "concern" for Garrett's reputation, R. p. 146, but still seemed to hold him in high esteem. One witness testified that he found the whole incident funny, even hilarious.

*879 DISCUSSION
In order to prevail in a case of defamation, the plaintiff must prove five elements: defamatory words, publication, falsity, malice and resultant injury. Carter v. Catfish Cabin, 316 So.2d 517 (La.App. 2d Cir.1975); Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196 (La. 1980).
Language is defamatory when it tends to expose the plaintiff to contempt, hatred, ridicule or obloquy, or causes him to be shunned or avoided, or has a tendency to deprive him of the benefits of public confidence or injure him in his occupation. Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958).
Based on our analysis of the facts, we have isolated four alleged defamatory acts:
(1) Roger Kneass telling Don Jones to get his "thugs" away at the Holiday Inn (The Firing Line incident);
(2) Roger Kneass telling the dinner party that Bobby Garrett had threatened his family (The Restaurant incident);
(3) Pat Anding reporting the threats on the evening news (The Channel 12 incident); and
(4) Roger Kneass circulating the letter about Jones's "gang" (The Letter).
We have analyzed these four acts in light of the Carter requirements and find that the evidence does not meet the standards for each of the incidents involved.

THE FIRING LINE INCIDENT
The trial court found that plaintiff proved that Kneass referred to him as one of "Jones's thugs" at the Firing Line debate. Is the word "thug" defamatory? In the case of Brown v. News-World Pub. Co., 245 So.2d 430 (La.App. 2d Cir.1971), we considered a newspaper editorial that allegedly characterized the plaintiff, the director of a local Community Action Program, as one of the "thugs and rioters picked up on the street to `work' as `teachers' and `leaders' in make-work projects." The editorial proceeded to single out the plaintiff, without using his name, as the "director [who had been] stripped of his salary and his job. It was losing his fat pay that he complained most about." The plaintiff sued, contending that the editorial, picturing him as "a pig, a criminal, an incompetent, lazy and dishonest" was defamatory. The trial court in Brown dismissed the petition for failure to state a cause of action. We affirmed, reasoning that the editorial, though "harsh and caustic, and perhaps crude," was not capable of a defamatory meaning.
In the instant case, the defendant was less articulate and less calculating than the defendant in Brown. Furthermore, "thug" is a name that does not impute any particular crime to the plaintiff; it is informal, and does not rise to the level of contempt or hatred. Madison v. Bolton, supra. We have similarly held that the expression "s.o.b.," only not abbreviated, is not necessarily defamatory. Harris v. Levy, 353 So.2d 1065 (La.App. 2d Cir.1978). See also Artieta v. Artieta, 15 La.Ann. 48 (1860), which holds that "rogue" is not defamatory.
Moreover, the statement must be taken in its context. Brown, supra; Cangelosi, supra. Under the context questions of publication and falsity, the plaintiff has failed to make his case.
On the issue of publication, we ask whether Kneass communicated that Garrett was one of Jones's thugs. The plain reading of Kneass's statement reveals no mention of Garrett at all. In fact, when Kneass spoke, no one was sure who he was talking about. R. p.p. 78, 121. There is no publication unless the statement refers to the plaintiff. Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); Brown v. News-World Pub. Co., supra.
On the issue of falsity, the trial court found that Garrett had not threatened Kneass's family. This finding is supported by the evidence and is not manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). That particular alleged threat, however, is not the only possible fact that could have led to Kneass's *880 outburst. One witness related an incident where plaintiff and defendant, who both coached softball teams, got into a dispute over who had the right to use a softball field. Garrett allegedly assaulted a member of Kneass's women's softball team with a bat. Even if we assumed that the word "thug" was defamatory and that Kneass called Garrett a thug, and accepting the trial court's finding that Garrett issued no threats that day, there is still some evidence to support Kneass's belief that Garrett had violent tendencies. This would substantially mitigate any liability. Francis v. Lake Charles Amer. Press, 241 So.2d 73 (La.App. 3d Cir.1970), aff'd 262 La. 875, 265 So.2d 206 (1971), appeal dismissed 410 U.S. 901, 93 S.Ct. 961, 35 L.Ed.2d 265 (1973); Perret v. New Orleans Times Newspaper, 25 La.Ann. 170 (1873).
We therefore find that the word used was not defamatory under the circumstances of this case. The Firing Line Incident cannot be a basis for liability.

THE RESTAURANT INCIDENT
The trial court found that Kneass told Ms. Anding's dinner party that Garrett had threatened his family. The accusation that imputes specific acts to plaintiff is unquestionably defamatory. There was publication, as he announced the story emotionally to the dinner group. The accusation was false and, under the circumstances, malice can be presumed. Carter, supra. Damage can also be presumed. Carter, supra; Trahan v. Ritterman, 368 So.2d 181 (La.App. 1st Cir.1979). Thus the trial was correct to assess liability for this act.
Since, however, the trial court did not allocate the damages between the alleged acts, some of which we reverse and some we affirm, we must consider factors that will affect the quantum. The damages arising from the restaurant incident cannot be great. The entire audience consisted of five people. Two of them, Ms. Anding and Mayor Blackburn, were politicians and accustomed to the high tension of campaigns. Ms. Anding testified that she had been receiving threats for the past thirteen years. Mayor Blackburn is reported to have said that nothing would come of it; thus we feel that to these two people, one more during a heated political campaign was of little significance. The same cannot be said for the other three members of the dinner party. They might well have lowered their opinion of the plaintiff as a result of Kneass's statement, but they should have also noticed his very agitated condition when he spoke, and discounted his words accordingly.

THE CHANNEL 12 INCIDENT
This alleged act poses a different issue. The trial court held Kneass liable for what Ms. Anding told news reporters later that day, especially in a live TV appearance on Channel 12. The trial court felt that Kneass caused this republication, based on the theory expressed in Wattigny v. Lambert, 408 So.2d 1126 (La.App. 3d Cir.1981), writ denied 410 So.2d 760 (La. 1981), cert. denied 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982), and Giordano v. Tullier, 139 So.2d 15 (La.App. 4th Cir. 1962). In both of these cases, the defamation resulted when newspapers printed stories about lawsuits in which certain innocent parties had been erroneously or maliciously named as defendants. The defendants, in turn, sued the plaintiffs or their attorneys for defamation or malicious prosecution. The original plaintiffs, now defending against claims of defamation, argued that the original author of a libelous publication should not be held liable for the voluntary repetition or republication of the story. The courts disagreed, announcing the rule that the author is responsible when republication is the "natural and probable consequence" of the author's act. While we agree with this formulation, we hold it does not apply here. The republication in the instant case was the natural and probable consequence of Ms. Anding's unilateral decision, perhaps politically motivated, to transmit the story to the news media. True, Kneass started the chain of causation, *881 but there is not the direct causal link necessary to hold him liable.
We distinguish the Wattigny and Giordano cases. It is accepted practice that newspapers and legal news bulletins routinely review all new suit filings and print them up. Everyone who sues or is sued is exposed to public view in this way, without any kind of discretion. More expansive coverage is given when a party happens to loom large in the public's eyes. By naming someone as defendant, the plaintiff or his attorney is expecting this sort of publication and is thus held liable for it. The same simply is not true when a campaign worker relates a personal problem to his candidate. Ms. Anding exercised the discretion to release the story. This interrupted the chain of "natural and probable consequence" that was so plain in Wattigny and Giordano. This incident is not a proper basis for liability on Kneass's part.

THE LETTER
Here we examine the letter that Kneass prepared and circulated to various newspapers and law enforcement agencies. The initial issue under Carter and Cangelosi, supra, is whether the words of the letter were defamatory. The pertinent language of the letter is as follows:
I would suggest that you advise Bobby Garrett and [Mr. Hall] that they keep as far away from my family as they possibly can because if they are seen approaching any of us, they will not be given the chance to carry out their threats as I will be prepared to defend myself and my family.
This language does not directly accuse Garrett of threats against Kneass's family but its clear impact is to call the reader's attention, indirectly, to "threats" that affected Kneass's family. Kneass failed to prove that Garrett made such threats. Consequently, the language is defamatory.
The third element under Carter, falsity, is apparent. Malice and resultant damages can be presumed. Carter, supra. The only remaining questions are the extent of publication and amount of damages. Our jurisprudence has long held that sending a letter to a third person whose opinion of the plaintiff's character may be affected, is a publication. Dickinson v. Hathaway, 122 La. 644, 48 So. 136 (1909); Jozsa v. Moroney, 125 La. 813, 51 So. 908 (1910). Under the circumstances of the instant case, we think the degree of publication was minimal. We note that one of the recipients of the letter, the FBI, already had a file on Mr. Garrett. R.p.p. 146, 164. Accordingly, this particular letter applied in large part to the official business of the recipient and could arguably be privileged. Dickinson v. Hathaway, supra. We also note that the newspaper recipients of the letter apparently decided not to publish it. Thus there is no evidence of widespread circulation and resultant damage.
All these factors that tend to reduce the extent of publication will also lessen the amount of damages. Reason dictates that the greater number of recipients, the larger the damages. Consequently, the quantum must be limited proportionately.

QUANTUM
The trial court concluded that the defendant had committed four acts of defamation against the plaintiff. His award obviously covered all four acts in a totality. Our review has shown that two of these incidents do not meet the legal requirements for recovery in defamation. Under these circumstances, the judgment must be reduced. We are sensitive to the great discretion accorded the trial court in matters of damages. LSA-C.C. art. 1999; Arceneaux v. Domingue, supra. However, the judgment below was so grounded on legal conclusions that must be reversed, that an award for the totality of the acts is manifestly erroneous. We will therefore reset the damages to accord with the law and the facts of this case.
We are guided in part by the jurisprudence on damages in cases of defamation. Trahan v. Ritterman, supra; Rosen v. Reed, 351 So.2d 1284 (La.App. 1st Cir. 1977), writ denied 353 So.2d 1340 (La.1978); *882 Higgins v. McGee's Discount Stores, 316 So.2d 472 (La.App. 1st Cir.1975), writ denied 320 So.2d 906 (La.1975).
We are also guided by the pertinent facts of the case. First, Kneass's audience in each instance was small and consisted of people whose opinions of the plaintiff were not appreciably changed. Second, the context of the incidents was a heady political encounter which fueled high tension and strained emotions. Finally, Garrett's witnesses were unable to establish any real damage to his reputation. Garrett nevertheless
and humiliation. Under these circumstances, we feel that an award of $2,500 is appropriate.
Accordingly, we affirm the trial court's ruling finding the defendant liable but amend the judgment to read as follows:
IT IS HEREBY ORDERED, adjudged and decreed that there be judgment in favor of plaintiff Bobby Garrett, and against defendant Roger Kneass in the amount of Two Thousand Five Hundred and .00/1.00 ($2,500.00) dollars, with legal interest thereon from date of judicial demand.
Costs of this appeal are assessed equally to plaintiff and defendant.
AMENDED AND AFFIRMED.