292 So.2d 251 (1974)
Waddy June JONES
v.
Roger N. SIMONSON.
No. 5941.
Court of Appeal of Louisiana, Fourth Circuit.
March 8, 1974.
*252 John D. Ponder, Charles L. Duke (Ponder, Duke & Richardson), Metairie, for plaintiff-appellee.
Charles C. Garretson (Nelson, Nelson, Garretson, Lombard & Rothschild), New Orleans, for defendant-appellant.
Before REDMANN and STOULIG, JJ., and FLEMING, J. Pro Tem.
REDMANN, Judge.
A landlord appeals from a $300 damage judgment. He had caused the arrest of plaintiff at her place of employment and her subsequent detention in jail for three hours. By answer to the appeal plaintiff asks damages be increased to $1,000, the maximum jurisdictional amount of the trial court, the First City Court of New Orleans (Const. art. 7, § 51, subd. B).
Defendant leased an apartment to one Pamela Abrams, by a written agreement which named plaintiff as an additional occupant but was signed by Abrams alone as lessee. The agreement named Abrams' mother as the person to be notified in an emergency. The apartment was unfurnished, but defendant did provide an oriental rug worth $300, some lamps of minor value and some pots and pans. At a time when plaintiff had been away several days because of illness, Abrams elected to remove from the premises. She took with her not only her own furniture but also a piano and bed belonging to plaintiff and the rug (and, according to defendant, the lamps) belonging to defendant.
On a Saturday plaintiff became aware of Abrams' move. Plaintiff went to the apartment intending to resume occupancy and found the furniture gone. She therefore removed her clothing etc. to her mother's home.
On the next day, Sunday, defendant was advised by a relative (who lived with defendant in the same building as the rental apartment) that the drapes were down and then, after defendant's order to enter the apartment, that all the furniture was gone, including defendant's rug. Defendant instructed his relative to call the police, and was subsequently visited by the police at his place of work.
Also on Sunday (whether before or after calling the police is not shown), defendant called Abrams' mother, who asserted ignorance both of the rug and of her daughter's whereabouts. Plaintiff (at her mother's home) received a call from Abrams advising she had plaintiff's piano and bed and also had defendant's rug. According to plaintiff, plaintiff insisted she would not again speak with Abrams if Abrams did not call defendant and return the rug.
Abrams did call defendant Sunday. (Defendant testified that during the conversation he told Abrams "the police have been called and this has been reported missing." It is not clear whether the police had already visited defendant and the warrants for arrest had been issued at this time.) According to defendant, Abrams' call advised she had taken the rug to clean because she had soiled it, but, defendant testified, she "kept changing her story" as to whether she was going to take the rug to a cleaner or had already taken it. Yet, though Abrams told him she was no longer employed, defendant did not ask her for her new home address: "I thought she would lie anyway. * * * And I was not going to go to her apartment anyway. Because the last time I wassaw people around the apartment there were quite a few big guys that I wasn't sure that I couldI didn't want to approach them about this carpet. I wanted to do it through regular channels. She should have brought it back to me. And I didn't want to approach her wherever she was living."
Thus instead of pursuing his tenant who admitted she had taken the rug, defendant elected to pursue the other occupant because he could find her at work. And on the next day, Monday, defendant verified *253 with plaintiff's employer that she was at work and called the police to meet him there. Plaintiff's supervisor testified that defendant created a disturbance in the place of employment. The supervisor testified defendant "insisted that June had taken his oriental rug. And after I had spoken with him a little longer, he told me that June and Pam had rented an apartment from him and that the rug was missing. He knew that June had not taken it. But he didn't know where Pam was and he knew where June was. So he came and got June."
Plaintiff was publicly accused by defendant of theft ("You took my rug") at her crowded place of employment and was arrested at 1:15 p. m., taken to jail, booked with theft of property valued at $500, fingerprinted and jailed. Because the arresting police officers interested themselves in plaintiff's plight, the charge was promptly nolle prosequied by the district attorney's office and plaintiff was released about 4:30 or 5 p. m.
Defendant himself attempted to assist plaintiff but could not immediately locate his lawyer. Defendant also sought to avoid the arrest of plaintiff but only, as he testified four times, "if the girl can tell me where the rug is and I can get my property back, that's all that I am interested in."

Liability
Louisiana's basic tort law is C.C. art. 2315's provision that "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Categorizations of tort, such as defamation, false imprisonment and malicious prosecution, typically derived from the common law's case-by-case genesis of right and relief, may sometimes impede rather than effectuate the civil law's basic principle of liability for damages caused by fault. See Comment, Tortious Liability for False Imprisonment in Louisiana, 1942, 17 Tulane L.Rev. 81 (which nevertheless recommends "false imprisonment" and "malicious prosecution" as uniform terms).
Great caution is necessarily demanded in determining "fault" in the context of society's efforts to suppress crime. Our Civil Code does not intend, and society could not tolerate, that reasonable efforts towards crime suppression be punished, and therefore curtailed, by civil liability for simple mistake. However, the efforts must be reasonable; the individual remains obliged to act as a reasonable person would, taking into consideration all of the circumstances. "Falseness" and "malice" serve conceptually to emphasize that not every mistake in defending one's self or community against crime is actionable "fault", but only such mistake as is not reasonably justified by the surrounding circumstances.
Doubtless most unjustifiable mistakes could be categorized as cases of malice. But suppose the recovery by an automobile sales company owner of an automobile previously reported stolen, and the later lending of this automobile to another while failing, by neglect, to first report to the police the fact of its recovery. Upon the detention of the driver by the police because of the earlier stolen car report, his claim for damages might be hampered by traditional common-law theories of "false" imprisonment or "malicious" "prosecution". Yet damages for the incarceration are awarded in Firstley v. Bill Watson Ford, Inc., La.App. 1972, 268 So.2d 314. Unqualified recitals that recovery in unjustifiable detention cases depends on proof of false arrest or malicious prosecution (such as that by this author in Tillman v. Holsum Bakeries, Inc., La.App.1971, 244 So.2d 681, 682, writ refused 258 La. 352, 246 So.2d 199) do not appear flexible enough in the face of a Firstley.
If need be, perhaps "malice" for purposes of malicious prosecution could be found in Firstley from the unconcern with which the dealer loaned to an innocent *254 party a car previously reported stolen. Perhaps in the present case, too, we could construe as "malice" the landlord's unconcern with plaintiff's innocence in the theft of his rug, his unconcern (after his tenant Abrams advised him she herself had the rug) over causing the public arrest and jailing of a woman about whom he could reasonably have retained no more than suspicion.
In our view, after receiving advice from Abrams that she had taken the rug to get it cleaned, defendant at least owed to plaintiff the duty to advise the police of Abrams' call so as to clear, to that extent, plaintiff of any presumption of guilt and thus of subjection to arrest and jailing. Having caused the issuance of a warrant for her arrest for theft on the basis of assumptions, he should, when information came to him from Abrams which invalidated or at least seriously questioned those assumptions, have caused the revocation of the arrest warrant. His breach of the duty owed to plaintiff was an unjustifiable mistake, constituting fault within C.C. art. 2315, which damaged her. He is liable.

Quantum
The trial judge had originally fixed quantum at $1,000 by default judgment but after new trial fixed quantum at $300. Therefore, though mindful of the trial court's "much discretion", C.C. art. 1934(3), we view the second quantum fixing as entailing a substantial reduction from the trial court's evaluation of damages at its jurisdictional maximum.
We see, as possibly mitigating damages, nothing other than the defendant's unsuccessful efforts to obtain plaintiff's subsequent release. Such efforts would ordinarily bring their own reward, by reducing time of incarceration and thus reducing the damages. They are not a defense to the claim for damages already actually caused nor a mitigation of those damages.
We agree with the trial judge's initial determination of quantum at $1,000 and we conclude that its reduction on new trial was unwarranted. Were the trial court one of unlimited jurisdiction and the earlier award a generous one, perhaps reduction within discretion limits would be appropriate. But the first award did not, because of the jurisdictional limit, approach the upper extreme of discretion limits but was, in our judgment, minimal.
The judgment is amended to increase the award to $1,000 and is otherwise affirmed at defendant's cost.
FLEMING, Judge (concurring in part and dissenting in part).
I concur in the finding that the defendant should be held liable for his tort against the plaintiff.
I respectfully dissent from the holding that the quantum should be increased from $300 to $1,000. I do not find that it was manifestly erroneous to award only $300. Appellate Courts should not alter awards unless the trial award is manifestly erroneous. "The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts"; Canter v. Koehring Company, 283 So.2d 716 (Sup.Ct.1973).