316 So.2d 517 (1975)
Ted Lewis CARTER, Plaintiff-Appellant,
v.
CATFISH CABIN et al., Defendants-Appellees.
No. 12627.
Court of Appeal of Louisiana, Second Circuit.
July 1, 1975.
*519 McKinley Law Offices by John B. McKinley, Monroe, for plaintiff-appellant.
Kostelka & Blackwell by Robert W. Kostelka, Monroe, for defendants-appellees.
Before BOLIN, PRICE and HALL, JJ.
HALL, Judge.
Plaintiff, Ted Lewis Carter, brought suit against Catfish Cabins of America, Inc. and James R. Hearn, seeking damages for alleged defamation and malicious prosecution of plaintiff by Hearn. After trial, the district court rendered judgment rejecting plaintiff's demands and plaintiff appealed. For the reasons set forth in this opinion we affirm the judgment of the district court.
Plaintiff was employed as a sales representative for a food products distributor or wholesaler. One of his customers was Catfish Cabin, a restaurant in Monroe of which the defendant Hearn was a part owner and manager.
The district court's written reasons for judgment clearly and accurately set forth the evidence and findings of fact, with which this court concurs in full:
"The suit grows out of the disappearance of a money bag containing cash, checks, keys and a pistol from the restaurant prior to opening on August 30, 1973, and the discovery thereof shortly after plaintiff's departure from the place. There is remarkably little controversy over the basic facts, plaintiff merely disagreeing with defense witnesses as to the location of a waitress when he left the premises, and defendant Hearn denying that he told one of plaintiff's superiors that plaintiff stole the money. There is also a slight disagreement between police witnesses and plaintiff's wife. Otherwise, the facts are generally agreed upon, and are found as follows:
"Hearn, a waitress and a cook were at the restaurant preparing for its opening at 11:00 a.m. Plaintiff called to collect for prior sales and to solicit an order. He and Hearn sat at a table near the `check-out' counter or booth, going over the invoices of prior sales, while the cook was in the kitchen and the waitress was moving back and forth between the two areas. Hearn went to the check-out booth to use a calculator in verifying the invoices, and was standing there when another waitress came in to get her payroll check (it was payday for the restaurant staff).
"Hearn had brought a money bag from home but had not yet transferred its contents to the cash register. In full view if plaintiff were watching, Hearn opened the bag, removed the payroll check and gave it to the waitress. The latter then went to the kitchen where she drank coffee with her sister (the cook), and then left. At about this moment, someone from an employment office entered, inquired of Hearn *520 if he had any openings and immediately left upon receiving a negative response.
"After paying plaintiff and giving an order, Hearn went to the kitchen to get mopping equipment; and while he was there, the working waitress also left the dining area. Plaintiff was thus left alone for a few minutes in the dining area, seated beside the check-out stand. The waitress returned to that area and exchanged remarks with plaintiff, who then left the premises.
"A moment or so later, Hearn returned from the kitchen, began mopping and instructed the waitress to get the key from the money bag and unlock the other front door, as it was nearly 11:00 o'clock. She reported she could not locate the bag. Hearn then searched the whole area and called the policereporting only that some money was missing. When investigating officers arrived, Hearn related the sequence of events in answer to police questions, but gave no names. Only upon the insistence of the senior detective did Hearn furnish the name of plaintiff. Both officers testified that Hearn repeatedly stated he was not accusing anyone of the theft.
"The detectives then went to plaintiff's home, arriving shortly after 1:00 p.m. He was not there, and they told his wife what they were investigating. They requested her to have plaintiff contact them and left.[1]
"When plaintiff arrived home, his wife told him of the detectives' visit. He made no effort to contact them, since he understood they were not then on duty. The following morning, he went to the police station and talked with the detectives. He verified virtually all facts given to the detectives by Hearn, admitted his financial difficulties, but denied theft of the bag or its contents. According to the detective, he even acknowledged that he was the most likely suspect; but he refused the detective's offer of a polygraph test. He stated he would take such a test after arrest but not before. Following additional discussion, the detectives arrested plaintiff, booked him for theft and took him to the parish jail.
"The senior detective then went to the office of the district attorney where he talked to an assistant. The latter would not then accept or file a formal charge because all of the information given him was not formally written up in a `police report'. He told the detective he would file the charge if given a full, formal report or if the `complainant' came in and signed an affidavit. The detective then urged Hearn to go to the district attorney's office, where he told the assistant the facts given the police. The assistant then prepared an affidavit (Exhibit P-1) charging plaintiff with theft, which Hearn signed.[2] A formal theft charge was then filed by the assistant.
"Several days later, in reviewing the file, the first assistant district attorney concluded that, in his opinion, there was insufficient corroborating evidence to be reasonably certain of bearing the burden of proof with a jury; and he dismissed the charge on his own motion. At about the same time, plaintiff engaged a firm which operates and interprets results from a machine called `Psychological Stress Evaluator' which makes a chart of electrical impulses from the voice and allegedly indicates whether or not a subject is being truthful in his answers to questions. The operator of the machine tested plaintiff regarding this matter and opined that he was *521 truthful; but there is no indication that the authorities relied upon this test, or even knew about it.
"In the meantime, on the afternoon of the occurrence, Hearn attempted to call one of plaintiff's superiors in Texas but did not reach him, requesting that the call be returned. He then called the district office of plaintiff's employer in Shreveport and requested that plaintiff not be allowed to return to Catfish Cabin. Both parties to this conversation agree that Hearn did not accuse plaintiff of the theft, but in response to inquiry as to the reason for his request, merely stated that a money bag was missing. When the Texas official returned Hearn's call the following day, Hearn made the same request of him. According to him, Hearn said `because he stole some money'; but Hearn denied such a statement. He testified that he may have indicated plaintiff had been charged with the theft, but insisted that he has never accused plaintiff to anyone.
"There is no evidence that plaintiff's employment has been affected by the incident, since he remains employed with the same firm in the same capacity. Neither is there any evidence that plaintiff has lost any customers other than Catfish Cabin. The claim of damages is based entirely upon the feelings of plaintiff and his wife as described by them in their reaction to this incident."
Based on the foregoing findings of fact the district court concluded: (1) the statements made by Hearn to the police officer and assistant district attorney were factual and accurate, not accusatory, and were not defamatory; (2) the same conclusion applies to the statements made by Hearn to plaintiff's superior in Shreveport; (3) it was not proved by a preponderance of the evidence that Hearn accused plaintiff of stealing the money in his conversation with plaintiff's superior in Fort Worth, but even if he did the communication was privileged; and (4) in signing the affidavit Hearn acted upon reasonable grounds, in good faith, without malice and under the guidance of officials.
On appeal plaintiff-appellant specifies the following errors:
(1) The trial court erred in holding the communications made by defendant to plaintiff's supervisors were not defamatory.
(2) The trial court erred in holding the communications made by defendant to plaintiff's supervisors were privileged communications.
(3) The trial court erred in holding the signing by the defendant of the affidavit charging plaintiff with theft was not malicious prosecution.
(4) The trial court erred in not awarding damages unto plaintiff against the defendants.
Within the ambit of LSA-Civil Code Art. 2315, Louisiana jurisprudence recognizes actions for defamation (libel and slander) and for malicious prosecution. Separate and distinct rules have been established governing the two actions which, however, sometimes overlap or arise simultaneously out of the same circumstances.
The essential elements of a defamation action are (1) defamatory words; (2) publication, that is, communication to some person other than the one defamed; (3) falsity; (4) malice, actual or implied; and (5) resulting injury. Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958); Rougeau v. Firestone Tire and Rubber Company, 274 So.2d 454 (La.App. 3d Cir. 1973); Sas Jaworsky v. Padfield, 211 So. 2d 122 (La.App. 3d Cir. 1968); Comment, 28 La.L.Rev. 82 (1967). The threshold issue is whether the words are defamatory, that is, capable of a defamatory meaning. Fleming v. Michot, 295 So.2d 821 (La.App. 2d Cir. 1974), writ refused 299 So.2d 802; Brown v. News-World Publishing Corp., 245 So.2d 430 (La.App. 2d Cir. 1971). If the words are defamatory on their face defamatory per sefalsity and malice are *522 presumed and the defendant has the burden of rebutting the presumption. Martin v. Markley, 202 La. 291, 11 So.2d 593 (1942).
Truth is an absolute defense to an action for defamation. Pool v. Gaudin, 209 La. 218, 24 So.2d 383 (1945). Another defense is justification or privilege. Privileged communications are divided into two general classes: (1) absolute or unqualified; and (2) conditional or qualified. An absolute privilege exists in a limited number of situations, such as certain statements by judges and legislators in their official capacities. In a broader number of instances, statements enjoy a conditional privilege. Madison v. Bolton, supra; Toomer v. Breaux, 146 So.2d 723 (La.App. 3d Cir. 1962).
The essential elements of a conditional privilege are described in Madison v. Bolton, supra, as "good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner and to proper parties only". In Toomer v. Breaux, supra, it was held that a conditional privilege is applicable "if the communication is made (a) in good faith, (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty. This privilege arises from the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate".
Appellant's assignment of errors numbers 1 and 2 relate to the action for defamation and must be considered in light of the foregoing principles of law.
Appellant contends firstly that the trial court erred in holding the communications by Hearn to appellant's superiors were not defamatory. He argues that the necessary implication of defendant's statements to the superior in Shreveport (Miller) was that he was accusing appellant of having committed a theft and that defendant directly accused appellant of having stolen the money in his conversation with the superior in Texas (Heath). The trial court held the statements to Miller were factual and not accusatory and made only at the insistence of Miller that he wanted to know why defendant no longer wanted plaintiff in his place of business. The trial court held plaintiff failed to prove defendant made the direct accusatory statement to Heath, giving weight to defendant's denial of the statement and to the corroborating circumstances that defendant was reluctant throughout to actually accuse plaintiff of the theft.
Reporting of the actual facts to plaintiff's superior with instructions to keep plaintiff out of defendant's place of business does not constitute a defamatory communication, that is, there were no defamatory words. If there was an implication that plaintiff was a thief, the implication arose in the mind of the listener from the actual true facts and not from anything false or untrue that defendant said.
The ruling of the trial court on this basically factual issue as to what was said in the telephone conversations, particularly the conversation with Heath, depending on an evaluation of the testimony of the witnesses, is entitled to great weight and cannot be said to be manifestly erroneous.
Even if defendant did accuse plaintiff of having stolen the money in his conversation with plaintiff's superiorsan accusation that was false and defamatory per se the communications enjoyed a conditional or qualified privilege. Under the circumstances, it was reasonable for Hearn to believe plaintiff took the money, or at least for him to be highly suspicious that such was the case. Under the circumstances, *523 it was reasonable for him to instruct the company with which he was doing business not to have plaintiff call on him. The telephone conversations to plaintiff's superiors were made in good faith and without malice. They were made to uphold a legitimate business interest in which both defendant and plaintiff's superiors had a mutual interest. The statements were limited in scope to such business purpose, were made on a proper occasion, in a proper manner, to proper parties only. All of the elements giving rise to a conditional privilege are present and afford defendant a defense, even if the statements made by him were defamatory.
The district court correctly held plaintiff is not entitled to recover for defamation.
Appellant's third assignment of error relates to his action for malicious prosecution. Louisiana jurisprudence has established clear-cut principles applicable to such actions. In an action to recover damages for malicious prosecution, the plaintiff must prove (1) termination of the proceeding in favor of the plaintiff; (2) lack of probable cause; and (3) malice on the part of the defendant. The existence of probable cause in any case depends upon the particular facts of that case. Probable cause does not depend merely upon the actual state of facts, but upon the defendant's honest belief of the facts in making the charge against the plaintiff. Malice exists where the charge is made with knowledge that it is false or with a reckless disregard as to whether it is false or not. Whittington v. Gibson Discount Center, 296 So.2d 375 (La.App.2d Cir. 1974). Where the charges made are dismissed by the prosecutor prior to trial, lack of probable cause and malice are presumed and the burden is on the defendant to prove he acted with probable cause and without malice. Robinson v. Rhodes, 300 So.2d 249 (La.App. 2d Cir. 1974), writ refused 303 So.2d 178.
In Whittington, this court also recognized an alternative approach to malicious prosecution actions enunciated in Jones v. Simonson, 292 So.2d 251 (La.App. 4th Cir. 1974). Reasonable efforts toward crime suppression should not be punished and, therefore, curtailed by civil liability for simple mistake. However, the efforts must be reasonable; the individual remains obliged to act as a reasonable person would, taking into consideration all of the circumstances. Not every mistake in defending one's self or community against crime is actionable fault, but only such mistake as is not reasonably justified by the surrounding circumstances.
In the instant case, defendant has borne the burden of proving he acted with probable cause, without malice and that his action in signing the affidavit charging plaintiff with theft was reasonable and justified under the surrounding circumstances.
Initially, Hearn reported to the police that the money bag was missing and related the known facts to the investigating officers. After investigation and questioning plaintiff, the detectives, on their own and without any semblance of prodding by defendant, arrested plaintiff for theft and turned the matter over to the district attorney's office. It was at the direction of the police officers that defendant went to the district attorney's office and it was with the encouragement and advice of the assistant district attorney that he signed the affidavit. The facts surrounding the disappearance of the money bag pointed a strong finger of suspicion at plaintiff, as plaintiff himself conceded during the investigation. It was reasonable for defendant to comply with what seemed to be an official request to sign the affidavit. He acted under the guidance of law enforcement officials, with probable cause, in good faith, and without malice.
The trial court correctly denied plaintiff recovery for malicious prosecution.
Appellant's fourth assignment of error, directed toward the trial court's failure to *524 award damages, necessarily falls with the conclusion there is no basis for liability.
For the reasons assigned, the judgment of the district court is affirmed at appellant's costs.
Affirmed.
NOTES
[1] "The detective testified that Mrs. Carter became upset, told them of severe financial problems with bankruptcy being filed and said something to the effect that this was piling on top of `all our troubles". She denied any such statements; and she and plaintiff both testified that if the police knew of their financial problems, Hearn must have told them.
[2] `Hearn testified he thought he was `supposed' to sign the form, which he took to be confirmation of his factual statements, and did not intend to be making a formal charge. The assistant district attorney did not recall the incident clearly, but said he was sure he had Hearn read the document before signing.