588 So.2d 1329 (1991)
Christine MARTIN, Plaintiff/Appellee,
v.
LINCOLN GENERAL HOSPITAL, et al., Defendants/Appellants.
No. 22894-CA.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1991.
Rehearing Denied November 27, 1991.
Randy D. Elkins, Minden, for plaintiff/appellee, Christine Martin.
Hayes, Harkey, Smith, Cascio & Mullens by Bruce M. Mintz, Monroe, for defendants/appellants, *1330 Lincoln General Hosp. and JoAnn Rainey.
Before NORRIS, HIGHTOWER and VICTORY, JJ.
NORRIS, Judge.
This is a suit for defamation. Christine W. Martin, a former employee of Lincoln General Hospital, alleged that Jo Ann Rainey and Willis C. "Jimmy" Colvin, also employees of Lincoln General, defamed her by giving false reports of financial improprieties to an auditor, who in turn conveyed these reports to Lincoln General's Board of Directors in a "management letter," on the strength of which the Board summarily fired her. She also alleged that her termination was wrongful, as the Board did not adequately investigate the allegations, but this claim was dismissed on the court's own motion by exception of no cause of action prior to trial. The parties proceeded to trial after which the jury absolved Jimmy Colvin. In response to a special interrogatory, however, the jury found that Jo Ann Rainey uttered defamatory words that were communicated to another, were false, with actual or implied malice and not subject to a qualified privilege, and that she did so in the course and scope of her employment. Judgment was rendered against Mrs. Rainey and Lincoln General for $250,000. The trial court denied these defendants' motion for judgment n.o.v., new trial or remittitur, and this appeal followed.
For the reasons expressed, we find that the appellants' second assignment of error has merit. The jury's failure to apply the qualified privilege is manifestly erroneous. The jury was plainly wrong to find that Mrs. Rainey's remarks to the auditor were actuated by bad faith or were in such reckless disregard of the truth that bad faith could be inferred; the record preponderates that Mrs. Rainey had a duty to respond to the auditor's questions and that there was a reasonable factual basis for her answers. We reverse.

Factual background
In 1985 Mrs. Martin, Mrs. Rainey and Mr. Colvin were all long-time employees of Lincoln General in Ruston. Mrs. Martin held two official positions: Personnel Director, who screened all job applicants and funneled them to the various department heads, who did the actual hiring; and Administrative Secretary to the hospital's administrator and CEO, Mr. Frank Jerome. She had worked for Mr. Jerome for over 20 years; they had a close business association and considered each other friends. Mrs. Martin also served unofficially as the hospital's "social director," responsible for sending flowers to employees' weddings and funerals, and planning the hospital's social functions. She was entitled to use the hospital's charge account at a Monroe florist shop, The Carlstedt Co., but she bought some flowers and other supplies at various stores. Her procedure was to pay cash and submit a request for reimbursement.
Defendant Jo Ann Rainey was an accounting supervisor who had also been at Lincoln General for over 20 years. Working under the Business Manager, Clyde Grau, she was in a position to receive and process employees' cash reimbursement requests and to pay for items that employees charged to the hospital's account. The other defendant, Jimmy Colvin, was Director of Maintenance.
In late spring 1985 Lincoln General began its annual audit, which was conducted by a prominent local CPA, Robert Holladay. To facilitate the audit, Mr. Grau instructed Mrs. Rainey and all other employees to cooperate with Mr. Holladay, give him any materials he asked for and answer his questions. The assistant administrator, Allen Tuten, verified that all employees were expected to cooperate with the auditor.
In the course of Mr. Holladay's inquiry, Mrs. Rainey and Mr. Grau disclosed that there had been an increasing number of cash reimbursement requests without a hospital purchase order and often with no more documentation than a store cash register tape and an employee's signature. The items were small but, according to Mrs. Rainey and Mr. Grau, were growing in frequency. Without singling out any *1331 employee, Mr. Holladay requested and reviewed all cash reimbursement requests and found quite a few from Mrs. Martin, including several based on unitemized cash register tapes and some claims for travel expenses without receipts. He also found a sales slip from The Carlstedt Co. that Mrs. Martin had approved but not turned in for over two months, after the fiscal year ended; according to Mr. Grau, the past due bill caused some confusion with the hospital auxiliary.
Jimmy Colvin told Mr. Holladay that the hospital had received an invoice from Holstead's Inc., an air conditioning contractor, for repairs to the air conditioner at Mrs. Martin's house. He had refused to approve the charge.
Mr. Holladay questioned them further, and Mrs. Rainey responded that she had heard that some employees were getting cafeteria meals for their family members without paying for them; that food service employees had fixed food for a party at Mrs. Martin's house; and that Mrs. Martin had several relatives working at the hospital. Mrs. Rainey testified that she told Mr. Holladay to talk to the employees who had first hand knowledge of these matters, but he admitted he did not. He was much more concerned with the cash purchase reimbursement policy allowed by Mr. Jerome and frequently utilized by Mrs. Martin.
According to his audit notes, Mr. Holladay spoke to Mr. Jerome about the problem. Mr. Jerome replied that if Mrs. Rainey or Mr. Grau were uncomfortable with a disbursement, then the department head should route it to him; if he approved it, the request would be paid. Mr. Jerome testified that Mrs. Martin had free rein to buy flowers and food for funerals but she was "lackadaisical" about turning in the invoices.
Mr. Holladay completed the audit in July 1985. He also submitted to the Board of Directors a "management letter" to note and criticize various financial practices at the hospital. Part of this letter pertained to Mrs. Martin. Because it is a major component of the defamation claim, we reproduce it in full:

LINCOLN GENERAL HOSPITAL, INC. MANAGEMENT LETTER MATTERS

July 26, 1985

CHRIS MARTINPERSONNEL DIRECTOR
A number of disclosures sensitive to the hospital personnel director, Chris Martin, were made to us by hospital personnel. The nature of these transactions is such that it was not possible to document, but could only be verified by other hospital employees who had personal knowledge of the events as they transpired. Those reported to us were as follows:
1. Personal purchases charged to the hospital by Chris Martin primarily include flowers, pot plants and nursery supplies from Oscar G. Carlstedt Co. in Monroe and local flower shops.
An invoice dated April 26, 1985, from Oscar G. Carlstedt Co. in Monroe was held by Chris Martin without payment til July 10, 1985, which caused embarrassment to the Hospital Pink Ladies (who also purchase from this company) when questioned (in error) by the vendor as to why the invoice had not been paid.
2. Purchase of Christmas decorations not used at Hospital, but taken to her residence for personal use.
3. Reports that parts and air conditioning repairs at her residence have been charged to the Hospital by Holsteads, Inc. (with no subsequent reimbursement).
4. Reports that food has been prepared by the Hospital Dietary Department for personal social functions at her residence.
5. Reports that as personnel director she has employed several family members in various departments of the Hospital who keep her informed about matters unrelated to her position as personnel director.
6. It was also reported that on occasion free meals have been provided in the *1332 hospital cafeteria to family members of Chris Martin.
7. We recommend that the foregoing improprieties be investigated by someone other than Mr. Jerome and that appropriate steps be taken to assure that these practices will not continue. We also recommend that Chris Martin not be permitted to make or approve for payment any purchases whatsoever.
The entire letter was sent to the Board's finance committee. William Marbury Jr., a member of the committee, testified that he met with Mrs. Rainey, Mr. Grau and Mr. Colvin to question them about the allegations. Mrs. Rainey replied that on a number of occasions Mrs. Martin had asked her for travel advances or checks without vouchers or with little documentation. Mr. Marbury testified that the letter and Mrs. Rainey's disclosures prompted an investigation but he was very vague as to the exact nature of the investigation; he admitted he had no concrete evidence to back up the allegations of the letter. He felt, however, that Mrs. Martin was violating hospital procedure. Another Board member, Howard Wright Jr., testified that he was aware of the particular Carlstedt Co. invoice as well as the unpaid Holstead's invoice, but he did not contact the vendors or even ask Mrs. Martin to explain the apparent problem. He looked at several checks and register tapes, but felt that the Board did not actually conduct an investigation.
The minutes of the Board's regular meeting of September 16, 1985 make no reference to the audit, letter or any investigation. The minutes of a September 25 special meeting recite that Mr. Marbury "reviewed the management letter and gave the report of the Audit Committee stating that the committee was of the opinion that Frank Jerome could no longer effectively administer the hospital"; he moved that Mr. Jerome and Mrs. Martin be requested to submit their resignations or else be terminated.
The following day, September 26, Mr. Marbury told Mrs. Martin that her duties were terminated. Mrs. Martin was totally unaware of the letter or the allegations; neither Mr. Marbury nor anyone else on the Board would tell her why the action was taken.
Mrs. Martin wrote several letters seeking reinstatement, and appeared before the Board in November 1985, offering to address any comments, questions or allegations. Although the minutes recite that there was "some discussion," Mrs. Martin testified that she was met with silence. She later filed a complaint with the Equal Employment Opportunity Commission, urging age discrimination. Lincoln General defended by asserting that Mrs. Martin "had totally and completely lost her effectiveness and creditability [sic] to perform her duties as Director of Personnel"; it attached a copy of the management letter. The EEOC declined to proceed, as it could not substantiate the allegations of discrimination. However, Mrs. Martin filed a Freedom of Information Act request and finally obtained a copy of the management letter. The instant suit against Mrs. Rainey, Mr. Colvin and Lincoln General followed.

Discussion
Before discussing the elements of defamation and the qualified privilege, we would note with the trial court that Mrs. Martin had no cause of action against Lincoln General for wrongful discharge. She did not have a contract of employment for a fixed term, so the employer was free to dismiss her at any time without assigning a cause. La.C.C. art. 2747.
In order to prevail in a case of defamation, the plaintiff must prove five elements: defamatory words, publication, falsity, malice (actual or implied), and resultant injury. Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196 (La.1980); Carter v. Catfish Cabin, 316 So.2d 517 (La.App. 2d Cir.1975).
Language is defamatory when it tends to expose the plaintiff to contempt, hatred, ridicule or obloquy, or causes her to be shunned or avoided, or has a tendency to deprive her of the benefits of public confidence or injure her in her occupation. *1333 Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958); Garrett v. Kneass, 482 So.2d 876 (La.App. 2d Cir.), writ denied 484 So.2d 671 (1986). Words that impute crime to another are defamatory per se; proof of malice is not required. Cangelosi v. Schwegmann Bros., supra; Elmer v. Coplin, 485 So.2d 171 (La.App. 2d Cir.), writ denied 489 So.2d 246 (1986). Publication means the communication of non-privileged defamatory words to even one single person. Toomer v. Breaux, 146 So.2d 723 (La.App. 3d Cir.1962), writ denied (not reported, 1963). A defendant who utters a defamatory statement is responsible for all republication that is the natural and probable consequence of the author's act. Wattigny v. Lambert, 408 So.2d 1126 (La.App. 3d Cir.), writ denied 410 So.2d 760 (1981), cert. denied 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982); Giordano v. Tullier, 139 So.2d 15 (La.App. 4th Cir.1962).
Truth is an absolute defense to an action for defamation. Pool v. Gaudin, 209 La. 218, 24 So.2d 383 (1945). Another defense is justification or privilege, of which there are two kinds: absolute or unqualified, and conditional or qualified. The absolute privilege is very limited and is not applicable to this case. See Carter v. Catfish Cabin, supra.
The conditional privilege exists in a broader number of situations. In Toomer v. Breaux, supra, the court defined its scope:
[A] publication enjoys a "qualified" or conditional privilege * * * if the communication is made (a) in good faith, (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty. This privilege arises from the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate. 146 So.2d at 723.
The jurisprudence has repeatedly held that communications between appropriate persons within the employer's walls, concerning allegations of conduct by an employee that bears on the employer's interest, are subject to the qualified privilege if made in good faith. Cangelosi v. Schwegmann Bros., supra; Henderson v. Guillory, 546 So.2d 244 (La.App. 2d Cir.), writ denied 551 So.2d 635 (1989); Carter v. Catfish Cabin, supra; Jones v. Wesley, 424 So.2d 1109 (La.App. 1st Cir.1982); Ward v. Sears, Roebuck & Co., 339 So.2d 1255 (La. App. 1st Cir.1976); Clements v. Ryan, 382 So.2d 279 (La.App. 4th Cir.1980); Cashio v. Holt, 425 So.2d 820 (La.App. 5th Cir.1982), writ denied 430 So.2d 94 (1983); Rouly v. Enserch Corp., 835 F.2d 1127 (5th Cir. 1988).
In this case it is readily apparent that Mr. Holladay, as auditor of Lincoln General, had a duty to investigate the finances of the hospital, and that Mrs. Rainey, as an accounting supervisor, had a corresponding duty to furnish him with any information he may require that bears on the hospital's finances. She had, moreover, special knowledge of the finances which other employees, such as staff physicians and nurses, would not have. Both Mr. Holladay and Mrs. Rainey had a vital interest in ascertaining and securing the hospital's financial well being. Under these circumstances, Mrs. Rainey's remarks to Mr. Holladay will be subject to the qualified privilege if made in good faith.
The crucial issue, therefore, is Mrs. Rainey's good faith in making the statements to Mr. Holladay. "Good faith" means that a statement is made with reasonable grounds for believing it to be true. Only when lack of such reasonable grounds is found can it be said that the person uttering the statement is actuated by malice or ill will. Ward v. Sears, Roebuck & Co., supra; Williams v. Touro Infirmary, 578 So.2d 1006 (La.App. 4th Cir.1991).
Before reviewing the evidence closely we would note an evidentiary problem. Unlike the plaintiffs in cases like Cangelosi v. *1334 Schwegmann Bros., Garrett v. Kneass and Clements v. Ryan, supra, and other cases, Mrs. Martin did not hear Mrs. Rainey utter the words or see a writing that she had prepared. There is only Mrs. Rainey's and Mr. Holladay's testimony and the letter itself. It is not clear that the letter is an accurate representation of what Mrs. Rainey said. For instance, Mrs. Rainey denied ever using the word "improprieties" to describe Mrs. Martin's conduct, and Mr. Holladay testified this word was of his own choosing. During the audit Mr. Holladay took rough notes which he later edited and condensed into the management letter; he denied that Mrs. Rainey told him what to put in the letter at all. R.pp. 615, 617. Despite these problems, we have analyzed the letter as an accurate representation of Mrs. Rainey's statements.
Item No. 1, personal purchases of flowers, potted plants and nursery supplies from the Carlstedt Co. and local flower shops on the hospital's account. The letter does not allege that she failed to repay the hospital for these purchases. Mr. Holladay testified he got this information from Mr. Grau, Mrs. Rainey and Mr. Colvin; his audit notes add that Mrs. Rainey directed him to Eddie Ray Hammons, a maintenance worker and relative of Mrs. Martin's, as her source of this information. R.p. 607. Mrs. Rainey testified she was not the actual source of the allegation but she turned over all the Carlstedt Co. invoices, at Mr. Holladay's request, and instructed him to talk to Eddie Ray Hammons, who had been complaining about finding invoices for items that he did not see around the hospital. R.pp. 308, 661, 676. Mr. Colvin testified that Eddie Ray Hammons had specifically questioned him about some Carlstedt Co. purchases. R.p. 288.
Eddie Ray Hammons was a reluctant and uncooperative witness. Most of his testimony is rambling and evasive, but he admitted that on at least one occasion he lodged a complaint about Mrs. Martin making personal purchases on the hospital's account. R.p. 739. He admitted having several other discussions about this and related matters with Mrs. Rainey and Mr. Colvin. R.pp. 740-741.
Mr. Grau testified that it was accepted practice to let employees buy things "through" the hospital, and Mr. Jerome verified that he permitted employees, Board members and other "prominent citizens" to charge things to the hospital's account with no set time for reimbursement. R.pp. 202, 203. He admitted that Mrs. Martin had free rein to buy flowers and food, and she was "lackadaisical" about turning in invoices. R.pp. 181, 211.
Mrs. Martin admitted that she had "perhaps on occasion" made a personal purchase from the Carlstedt Co. and later reimbursed the hospital. R.p. 472.
As for the Carlstedt Co. bill of April 26, 1985, Mrs. Rainey testified she had been unable to find this sales slip until over two months later when it turned up "from Mrs. Martin." R.p. 675. The accounting department had asked Mrs. Martin for this to verify the bill. Mr. Grau testified he had some knowledge about it; Mrs. Martin had bought something on the hospital's account but the vendor accidentally charged it to the Auxiliary's account. R.p. 717. The error was compounded because the sales slip was missing for so long; Mrs. Rainey eventually got it from Mrs. Martin. The vendor had imposed a finance charge.
Mrs. Martin verified Mr. Grau's account of the incident: she made the purchase but mislaid the sales slip. R.p. 522. She denied that she intentionally held it. She admitted that she sometimes signed tickets for purchases that were billed, correctly or incorrectly, to the "Pink Ladies." R.pp. 500, 524.
Item No. 2, the allegation that Mrs. Martin was taking home the hospital's Christmas decorations for her personal use. Mr. Holladay's notes read, "See Eddie Hammons, referred by Rainey." R.p. 630. Mrs. Rainey testified she had no first hand knowledge of this but told Mr. Holladay to talk to Eddie Ray Hammons. Mr. Colvin testified that Eddie Ray Hammons had complained about some missing Christmas potted plants; he relayed this to Mr. Holladay when asked. Mr. Grau testified he had heard comments from Mrs. Rainey and Mr. *1335 Colvin, and from a personnel supervisor named KaCee Garrison.
Eddie Hammons admitted he flocked a Christmas tree for Mrs. Martin (as well as for other employees) at the hospital in 1983 or 1984. He also testified that there were more poinsettias purchased than were used at the hospital. He admitted speaking to Mr. Colvin about some missing decorations, but said he "wasn't responsible for" this so he could not be worried with it. R.p. 742. KaCee Garrison denied knowing anything about this allegation but was "sure" that Eddie Ray Hammons made some decorations at Mrs. Martin's house. R.p. 444.
Mr. Grau testified that the hospital generally allowed employees to borrow things that were not being used and Mr. Jerome testified he would have let her bring Christmas decorations home. R.pp. 706, 210. Mrs. Martin said she never brought any Christmas decorations home, but admitted that borrowing things was "not an uncommon practice"; if she ever borrowed anything, it was something the hospital was not using at the time and she returned it. R.p. 473.
Item No. 3, air conditioner repairs for Mrs. Martin's residence but charged to the hospital. Mr. Holladay identified his source as Mr. Colvin, who admitted he was "totally responsible" for this item. Mr. Colvin testified that Mrs. Martin telephoned in early June because her air conditioner was not working; he went out to her house and discovered the blower motor was broken. She asked him (according to Mrs. Martin, he offered) to order the part through one of the hospital's suppliers; he did so and had someone install it. Later, when the bill arrived, he refused to approve it for payment. It was in the unpaid invoice file when Mr. Holladay performed the audit. Mrs. Martin verified that she left the bill on her desk and did not take care of it timely; she remarked that her husband was not working at the time and funds were short. R.p. 475. Mrs. Martin paid the bill directly to Holstead's by check dated August 20, nearly a month after the management letter was written, and apparently not deposited until September.
Item No. 4, food prepared at the hospital dietary department for personal social functions at Mrs. Martin's residence. Mr. Holladay testified he got this information from Mr. Grau "and/or" Mrs. Rainey, but Mr. Grau denied any knowledge of it and Mrs. Rainey said she referred Mr. Holladay to KaCee Garrison. KaCee Garrison denied telling this to Mrs. Rainey.
Mrs. Martin testified that she could buy food from the cafeteria and reimburse the hospital, but this was not prepared food. She also admitted that she twice had hospital employees prepare food at the hospital cafeteria for her family reunions, but they did this after working hours and she paid them herself. R.p. 479.
The big incident on which everyone focused was a reception held at Mrs. Martin's house in March 1985. There was a reception or tea for the Louisiana Tech nursing graduates after each class's "pinning" ceremony. It was usually held at the hospital or the Holiday Inn. In March 1985 Mrs. Martin's daughter, Martie Shoffit, was in the graduating class so Mr. Jerome suggested holding the reception at Mrs. Martin's house. R.p. 185.
According to Mrs. Martin, all previous receptions had been sponsored by the nursing school, with the hospital holding only a breakfast for the graduates; in 1985, however, the hospital decided on a "new endeavor," a reception or tea that would involve the husbands and families of nursing graduates. R.p. 532. She felt that it was a hospital function, but admitted it was different because of her "very personal interest in that particular class." R.p. 488. According to Martie Shoffit, about half of the graduating class attended that year's reception, as did a lot of her own relatives. R.p. 379. The hospital prepared food and sent it to Mrs. Martin's house for the occasion. R.p. 488.
Item No. 5, Mrs. Martin has hired family members in various departments and they keep her informed about matters unrelated to her position. Mr. Holladay testified that he received this information from Mr. Grau or Mrs. Rainey. Mr. Grau testified that hiring relatives was a common practice, *1336 and Mrs. Rainey admitted telling him that she herself had relatives working at the hospital. She was not sure, however, that Mr. Holladay had asked her whether Mrs. Martin's relatives might be reporting to her, but they may have discussed it. R.p. 316.
As personnel director, Mrs. Martin did not actually hire employees; she reviewed résumés, screened applicants and directed them to the appropriate department heads. Five of her relatives worked at Lincoln General, including Martie Shoffit in the operating room and Eddie Ray Hammons in maintenance, but she had no relatives in her own department.
Mrs. Martin flatly denied that her relatives were keeping her informed about matters unrelated to her employment, and Martie Shoffit denied she was informing her. R.pp. 502, 381.
Item No. 6, free meals occasionally provided to Mrs. Martin's family members in the hospital cafeteria. Mr. Holladay testified that he got this information from Mr. Grau or Mrs. Rainey. Mr. Grau had no personal knowledge of it; Mrs. Rainey testified that Mr. Holladay asked this question with respect to all employees and she may have mentioned Mrs. Martin. R.p. 317.
Mrs. Martin admitted that on occasion her family had received free meals, but "it was not a privilege that was exclusive to Chris Martin" and occurred only about four times a year, when she had administrative duty. R.p. 480. However, she frequently carried her husband a cafeteria dinner without paying for it at the time. She explained that the next day she would tell the food service director, Mrs. Strother, or give her a note indicating what she had taken (but not the price) and pay for it later. R.p. 542. Mrs. Strother testified that Mrs. Martin gave her about 10 such meal tickets each month and she "assumed" Mrs. Martin paid for them. R.p. 426. She verified that the tickets did not list the price, and nobody else "charged" as many meals as Mrs. Martin. R.p. 439. Another food service worker, Ruth Madden, testified she sometimes saw Mrs. Martin slip a note under Mrs. Strother's door. Two other food service workers, Vera Moore and Cathy Bolin, testified that Mrs. Martin never paid them for the take-out meals, and they never saw her leave tickets or pay anyone else.
Item No. 7, recommendation that Mrs. Martin not be permitted to make or approve for payment any purchase whatsoever. Mrs. Rainey testified that in 1985 she was increasingly concerned about requests for reimbursement without formal invoices; Mrs. Martin often brought a plain cash register receipt. R.p. 680. Mr. Grau corroborated that he was concerned about poor documentation for these requests, but the problem was not confined to Mrs. Martin. R.p. 689. Mr. Holladay testified at some length about the hospital's reimbursement procedure, concluding that it lacked internal controls. He added that he did not believe (and his letter did not allege) that any of Mrs. Martin's reimbursement requests were "bogus," but the procedure was inadequate and subject to abuse. R.pp. 611-613, 625-628. The record is clear that nobody, including Mrs. Rainey, planted this suggestion in Mr. Holladay's mind; it was strictly his conclusion.
Mrs. Martin admitted that several of her reimbursement requests were not very specific, but no one ever criticized her procedure or told her to change it. R.p. 504.
Board member Howard Wright testified there was never any allegation that Mrs. Martin was receiving improper cash disbursements; rather, his decision to terminate her was based on her failure to supply proper documentation. R.p. 233. Board member William Marbury also said the lack of vouchers influenced his decision. R.p. 251. Both felt, however, that the auditor must have investigated this before including it in the letter, and admitted they never confronted Mrs. Martin or gave her the chance to defend herself before they fired her.
This synopsis of the testimony and other evidence convinces us that in every particular, Mrs. Rainey had reasonable grounds for giving any statement to Mr. Holladay that appeared in the management letter and was attributed to her. Other employees, *1337 including Mr. Grau and Mr. Colvin, gave similar statements. Mrs. Martin admitted that she had "on occasion" made personal purchases from the flower shop on the hospital's account; the letter did not accuse her of failing to repay the hospital for such purchases or to pay for the flowers herself. She also admitted that she misplaced the specific Carlstedt Co. sales slip, discussed it with accounting and turned it in over two months later; given these facts, it was not bad faith for Mrs. Rainey to say she "held" the slip. As for the decorations, both Mrs. Rainey and Mr. Colvin testified that Eddie Ray Hammons disclosed this to them; Eddie Ray Hammons was vague and defensive but tended to corroborate it; and there is no evidence that Mrs. Rainey was any less reasonable in making her statement than was Mr. Colvin, whom the jury cleared. The statements about the air conditioning repairs were totally factual; as of the date of the management letter, the bill was not paid. Mrs. Martin also admitted that food service employees had prepared food at the hospital for her family reunions; moreover, it was not patently unreasonable to construe this first-ever at-home reception involving Mrs. Martin's daughter and many family members as a personal function. The statement that several of Mrs. Martin's relatives were employed at the hospital was factual; given her position as personnel director, the inaccurate conclusion that she "hired" them is not so unreasonable as to amount to bad faith. It strains credulity to dispute that these relatives spoke to her about matters unrelated to her position at the hospital. Mrs. Martin also admitted that her family members received a few free meals at the cafeteria, and her "method" of paying for the rather frequent take-home dinners was such that a reasonable person would infer that they were free too. Mrs. Martin also admitted that many of her reimbursement requests were inadequately documented. In addition, a plain reading of the letter shows that Mr. Holladay was suggesting an investigation, not accusing anyone of wrongdoing. The internal practices he sought to remedy were widespread and matters of general knowledge. If an employee cannot speak to him about the practices when so requested, and he cannot label them as improprieties, no meaningful investigation could ever be pursued.
Moreover, the record is completely devoid of evidence to suggest that Mrs. Rainey was motivated by malice or ill will against Mrs. Martin. She did not seek out the auditor to make accusations; she replied to relevant questions. She did not ascend to Mrs. Martin's position or obtain any benefit from her dismissal. She was not aware that a management letter would be prepared and had absolutely no inkling that Mr. Jerome (and Mrs. Martin with him) would be asked to resign. On the contrary, the record overwhelmingly shows that Mrs. Rainey was neither actuated by malicious animus nor unreasonably heedless of facts; she merely related matters that were common knowledge at Lincoln General. The jury's failure to apply the qualified privilege was plainly wrong. The judgment must be reversed.
Because the statements were privileged, we have not restated the facts as they pertain to the five elements of a plaintiff's prima facie case of defamation. However, we would note that even if the privilege did not apply or Mrs. Rainey's comments exceeded the privilege, there are serious questions as to the requirements of publication and resultant injury on this record. Although defamatory words create a presumption of damage, the magnitude of the damage is often a function of the extent of publication. Garrett v. Kneass, supra. Mrs. Rainey made the allegedly defamatory remarks to one person, Mr. Holladay. Mr. Holladay received essentially the same information from two other employees, Mr. Colvin and Mr. Grau, and did not republish her statements to them. Mrs. Rainey expected Mr. Holladay to speak to at least two other employees, KaCee Garrison and Eddie Hammons, but he did not do so. In fact, Mr. Holladay republished her comments only to a finance committee of three members, who in turn conveyed it to the Board. Each republication was made in strictest confidence and without disclosure to the general public. *1338 The veil of secrecy undoubtedly added to Mrs. Martin's frustration and torment, as she went years before learning the reason for Lincoln General's action. However, this is such a limited amount of republication that it could not support the large quantum awarded here. The bulk of the publicity arose from an intervening cause, the Board's decision to seek Mr. Jerome's and Mrs. Martin's resignations, and this conduct is not actionable. La.C.C. art. 2747. Not all of Mrs. Martin's losses are the natural and probable consequence of Mrs. Rainey's remarks to Mr. Holladay. Even without the privilege, the instant award would have been excessive. With the privilege, the judgment must be reversed.
For these reasons, the verdict and judgment are reversed at appellee's costs. Judgment is rendered in favor of appellants, dismissing plaintiff's suit.
REVERSED.

APPLICATION FOR REHEARING
Before SEXTON, NORRIS, HIGHTOWER, VICTORY and BROWN, JJ.
Rehearing denied.